**Sammy GERACI, Petitioner,**

v.

**Daniel SENKOWSKI, Respondent.**

**No. 98–CV–1440 (JG).**

United States District Court,
E.D. New York.

Sept. 10, 1998.

Joel A. Brenner, East Northport, NY, for Petitioner.

Charles J. Hynes, District Attorney of Kings County, Brooklyn, NY, by Roseann B. MacKechnie Assistant District Attorney.

### MEMORANDUM AND ORDER

GLEESON, District Judge.

Sammy Geraci filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to vacate his 1992 conviction for manslaughter and assault. Thereafter, the respondent moved to dismiss the petition on the grounds that (1) the petitioner failed to commence this proceeding within the period of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA" or the "Act"), 28 U.S.C.

§ 2244(d)(1); and (2) the petitioner has failed to exhaust his state court remedies with respect to all of his claims. For the reasons set forth below, I conclude that the petition was not filed in a timely manner and that, in any event, it lacks merit.

### FACTS

At approximately 1:00 a.m. on April 20, 1990, following an argument in a Brooklyn nightclub, the petitioner stabbed Anthony Granese in the chest, fatally wounding him. As he fled from the scene, the petitioner also stabbed Rocky Giamportone in the arm and leg. The petitioner then entered a getaway car driven by his brother, Frank Geraci. Another of his brothers, Paul Geraci, apparently attempting to assist in his brother's escape, fired a gun into the crowd, hitting Anthony Gallo in the back. Someone called 911 and identified the petitioner as the person who did the stabbing.

Before the grand jury, Peter Terranova testified that he was present in the Brooklyn nightclub on the night of the stabbing and that he had seen the petitioner stab Granese and Giamportone. Thereafter, the prosecutor informed the trial judge that Terranova had stated to the prosecutor that, if called at trial, he intended to testify that he had *not* seen who stabbed Granese, thereby contradicting his own grand jury testimony. Based upon Terranova's statements, the prosecutor requested a *"Sirois* hearing" to determine whether the petitioner had been responsible for Terranova's decision to change his testimony and, if so, whether the prosecution should be allowed to introduce Terranova's grand jury testimony as part of its evidence-in-chief at trial. *See In re Holtzman v. Hellenbrand,* 92 A.D.2d 405, 460 N.Y.S.2d 591 (2d Dep't 1983). Over the objections of defense counsel, the trial court granted the request for a hearing.

At the hearing, the evidence showed that, on May 24, 1990, Peter Terranova called the 62nd Precinct to inquire about the status of the case. He was instructed to come to the precinct house, where he asked Detective Frank LaBarbera, who was assigned to investigate the homicide, why "nothing" had been done on the case despite the fact that he had called 911 on the night of the incident in order to identify the perpetrator. Terranova thereupon gave a detailed statement to LaBarbera, again identifying the petitioner as the man who stabbed Granese. Later that evening, Terranova gave a sworn audiotaped statement to an assistant district attorney, providing the same detailed account of the events he had given to LaBarbera.

Terranova stated that the incident began as a fist fight. Terranova was fifteen feet away, and observed the petitioner, whom Terranova had known for ten years, stab Granese with an "underneath motion" in the "chest approximately a little towards the left." The petitioner pulled out the knife, and attempted to flee the nightclub, but he encountered Giamportone, the owner of the bar, whom the petitioner stabbed in the leg. The petitioner then left the club and jumped into a white Ford Mustang driven by his brother Frank Geraci. Terranova had also left the nightclub and was approximately thirty feet away from the car as a group of Granese's friends chased the car, throwing bottles at it. At that point, another of petitioner's brothers, Paul Geraci, came running out the nightclub and fired a shot into the crowd.

A few days before he was scheduled to testify in the grand jury, Terranova met with LaBarbera and the assistant district attorney outside the Wall Street brokerage firm where Terranova worked. Terranova was nervous about the prospect of being seen at the district attorney's office and about testifying in the grand jury. The prosecutor sought to allay Terranova's concerns by explaining the rules of grand jury secrecy and by telling Terranova that he would try to schedule his testimony at an "off time." Terranova appeared in the grand jury on June 19, 1990, and provided the detailed account implicating the petitioner that he had previously provided to LaBarbera and the assistant district attorney. The petitioner was indicted for murder in the second degree and two counts of assault in the first degree.

In November 1991, the assistant district attorney discovered that the grand jury minutes were missing. He contacted Terranova (who had had limited contact with law enforcement since his grand jury appearance five months earlier), who reported that the

petitioner had recently encountered him on the street and asked him to meet with the petitioner's attorney. Terranova reported that he had declined that request, stating that he did not want to get involved.

On January 13, 1992, shortly before the petitioner's trial was scheduled to start, Terranova left his well-paying job at the brokerage firm without notice. His mother later told the firm that he would not be returning and not to ask any questions about him. One week later, Terranova fled the jurisdiction and could not be found despite extensive efforts by the prosecutor.

On February 5, 1992, LaBarbera and the assistant district attorney questioned Terranova's mother about his whereabouts. She would not reveal any information, and apparently was threatened with prosecution for obstructing justice. Thirty minutes after she left the precinct house, Terranova called the detective and prosecutor from Florida. During the conversation which ensued, a conversation which was taped, Terranova asked how "they" found about him. He stated that, in January, he had been asked to meet with an individual who showed him his testimony, and that he feared for himself and his family. According to Terranova, he was told that if he stayed away until the trial was over, neither he nor his family would be hurt. He stated that, if he was called to the stand, he would lie; he further stated that he hated the petitioner.

On March 5, 1992, Terranova was picked up by the police and brought to the assistant district attorney's office. He stated, again, that he had been shown his testimony. The next day he informed the prosecutor that he had received money from "them" and that a friend of his had gone to Harlem to see the petitioner's uncle. That evening, he took the detective aside and stated that he had not in fact seen the stabbing because he had been in the parking lot during the incident.

At the hearing, Terranova stated that he had been inside the nightclub at the time of the stabbing, but that he could not identify the perpetrator. In order to explain the discrepancy between his prior statements and his current account, Terranova stated that he was unsure about the accuracy of his prior statements because the nightclub was crowded and dark and he had been drinking. He denied calling 911, but admitted he told the detective he had done so. He also admitted that, when he met with the detective and prosecutor outside his place of business in June of 1990, he expressed concern about being seen testifying before the grand jury. He further conceded that he left his job and the jurisdiction to avoid testifying at trial, but stated that he did so because he was unsure of what he saw on the night of the incident. Terranova confirmed that the audiotaped phone conversation, which was admitted at the hearing, reflected the conversation he had with the detective and prosecutor on February 5, 1992. He denied speaking to the defendant about the case, and claimed that his only fear was that he would be prosecuted for perjury.

After conducting the foregoing hearing, the trial court issued a memorandum decision. *See* Respondent's Exhibit B. In that decision, the trial court, after setting forth the foregoing facts, found that the prosecution had proven by clear and convincing evidence that the petitioner had threatened Terranova and that if Terranova were allowed to testify at trial, he would testify falsely. Based upon the foregoing, the court ruled that Terranova was "practically unavailable" to testify and that, accordingly, the prosecution could introduce Terranova's grand jury testimony as part of its case-in-chief. The trial court also held that the People did not have to call Terranova to the witness stand. Respondent's Exhibit B at 17 ("Because I declare Terranova an unavailable witness, the court declines the defendant's alternative request to compel the People to call him as a witness.").

At trial, the prosecution called, *inter alia*, Katherine Citarrella, who testified that one week before the night of the fatal stabbing, she had been in a bar and had seen two groups of men engaged in a fight. She testified that she had seen the petitioner, who was in one group, hit Granese, who was in the other group. In addition to Citarrella, the prosecution also called several employees and patrons of the Brooklyn nightclub. Although they all had been present at the time of the stabbing, they testified that they had

not seen who stabbed Granese. The prosecution also introduced Terranova's grand jury testimony, which was read into the record by a court reporter.

After the prosecution rested, the defense called Vincent Michelino. Michelino stated that Terranova had been outside the bar at the time of the stabbing, and therefore that he could not have seen who stabbed Granese.

Based upon the foregoing, the jury convicted the petitioner of one count of manslaughter in the first degree and two counts of assault in the first degree. On April 23, 1992, the court sentenced the petitioner to an indeterminate term of imprisonment of eight and one-third to twenty-five years on the manslaughter count and five to fifteen-years on each of the assault convictions. The sentences on the manslaughter and one of the assault convictions were imposed consecutively; the sentence on the second assault conviction was to run concurrently to the other two sentences. The total sentence was thus thirteen and one-third years to forty years.

In an appeal from his judgment of conviction to the Appellate Division, the petitioner claimed that (1) the trial court's decision to permit the prosecution to introduce Terranova's grand jury testimony was improper; (2) the prosecution's reference to the defendant's brother during trial was improper and constituted reversible error; and (3) his sentence was harsh and excessive. The Appellate Division, Second Department, unanimously affirmed the petitioner's judgment of conviction on January 31, 1994. *See People v. Geraci*, 200 A.D.2d 758, 607 N.Y.S.2d 116 (2d Dep't 1994). On March 28, 1995, after the petitioner was granted leave to appeal, the Court of Appeals unanimously affirmed the order of the Appellate Division with respect to the question of the introduction of Terranova's grand jury testimony. *See People v. Geraci*, 85 N.Y.2d 359, 625 N.Y.S.2d 469, 649 N.E.2d 817 (1995).

Thereafter, the petitioner moved pursuant to New York's Criminal Procedure Law § 440.20 for an order setting aside his sentence on the ground that it was illegally imposed ("the § 440 motion").[1] The petitioner contends that the motion was filed on February 1, 1997.

On April 7, 1997, while the petitioner's § 440 motion was pending, the petitioner filed a habeas petition in this Court. *See Geraci v. Senkowski*, 97–CV–1720. In an order dated May 1, 1997, I dismissed the petition "[b]ecause [the] petitioner ha[d] yet to exhaust his state court remedies." Thereafter, in a decision and order dated April 24, 1997, the state court denied the petitioner's § 440 motion. After the petitioner sought leave to appeal the denial to the Appellate Division, that court, in an order dated August 25, 1997, denied leave to appeal.

Geraci then petitioned for a writ of error *coram nobis*. In that petition, he argued that his appellate counsel was constitutionally ineffective for failing to raise the issue of the admissibility of hearsay at the petitioner's pretrial hearing, for failing to raise the issue of trial counsel's failure to call Terranova at trial, and because he suffered from an actual conflict of interest. The petitioner contends that he filed the petition on November 11, 1997. The Appellate Division denied the application for *coram nobis* relief in an order dated February 17, 1998.

The petitioner filed the instant petition for a writ of habeas corpus on February 24, 1998. In it, the petitioner argues that: (1) his trial counsel rendered constitutionally ineffective assistance of counsel by failing to call Terranova as a witness; (2) in finding Terranova to be unavailable, the trial court improperly relied upon uncorroborated double and triple hearsay; (3) his appellate counsel rendered constitutionally ineffective assistance by failing to argue on appeal that the trial court's reliance on hearsay was improper; (4) the trial court erred by finding that Terranova changed his testimony as a result of threats originating with the petitioner; (5) the trial court violated his Confronta-

---

1. Specifically, the petitioner argued that, during his sentencing proceeding, the court: (1) relied on misinformation not included in the probation report; (2) based the petitioner's sentence on uncharged crimes and bad acts; (3) imposed a sentence which was intended to rectify perceived leniency previously enjoyed by the petitioner; (4) increased the petitioner's sentence because the petitioner did not show remorse; and (5) determined the petitioner's sentence before the petitioner or his attorney had the opportunity to make their statements.

tion Clause rights by finding Terranova to be legally unavailable; (6) the trial court erred by admitting evidence of bad acts committed by the petitioner's brother; (7) his due process rights were violated during his sentencing; and (8) his appellate counsel suffered from a conflict of interest which rendered him incapable of providing constitutionally effective assistance of counsel.

On April 17, 1998, the respondent filed a motion to dismiss the petition on the ground that petitioner failed to file within the period of limitations set forth in the AEDPA and on the ground that the petition contains a claim which has not been exhausted in state court. The respondent filed an opposition to the merits of the petition on May 29, 1998.

## DISCUSSION

### I  The Motion to Dismiss

■ The AEDPA, which was signed by President Clinton on April 24, 1996, requires that a federal habeas corpus petition be filed within one year of the date a state court judgment of conviction becomes final. *See* 28 U.S.C. § 2244(d)(1)(A). Although Congress did not give specific guidelines about the retroactivity of this provision, the Second Circuit recently held that prisoners whose convictions became final prior to the effective date of the Act "should [be] accorded a period of one year after the effective date of AEDPA in which to file a first § 2254 petition." *Ross v. Artuz,* 150 F.3d 97, 102 (2d Cir.1998).

Here, the petition was filed on February 24, 1998, well over a year after the effective date of the AEDPA. However, any period

during which review of a judgment is taking place in state court is not counted toward the one-year filing limit. *See* 28 U.S.C. § 2244(d)(2). Specifically, § 2244(d)(2) provides that "[t]he time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

The parties disagree with respect to the question of how long the petitioner's two post-conviction motions were pending. According to the respondent, the motions were pending until the date the Appellate Division rendered its decisions with respect to the § 440 motion and *coram nobis* petition, August 25, 1997, and February 17, 1998, respectively. By contrast, the petitioner contends that they were pending until the date his attorney received notice that the Appellate Division had rendered its decisions, September 9, 1997, and February 23, 1998, respectively.[2]

I conclude that, in this context, the word "pending" in § 2244(d)(2) has an unambiguous meaning: a motion is pending if it has been filed with the Court but has yet to be decided.[3] Accordingly, once the relevant motions were decided in state court, they were no longer pending. I therefore find that, at least where, as here, the habeas petitioner was represented by counsel in connection with his post-conviction motions, those motions were "pending" until the dates the Appellate Division rendered its decisions, *i.e.,* August 25, 1997, and February 17, 1998, respectively.

---

**2.** The parties also disagree about the dates on which the petitioner's post-conviction motions were filed: the respondent contends that the petitioner's motions were filed on the date they were received by the court (February 7, 1997, and November 14, 1997, respectively), while the petitioner contends that they were filed on the date they were mailed (February 1, 1997, and November 11, 1997, respectively). Because I conclude that, even assuming that the motions were filed on the date they were mailed, the petition is untimely, I need not resolve this disagreement.

I also need not address the fact that the respondent contends that the instant petition was filed on February 25, 1998 (the date it was time stamped) and the petitioner contends that it was

filed on February 24, 1998 (the date the petitioner asserts that it was "received" by this Court). Assuming it was filed on February 24, it still was filed in an untimely manner.

**3.** My conclusion is bolstered by the fact that, in the federal system, a party desiring to appeal from a district court's decision has thirty days from the entry of judgment—rather than receipt of notice that judgment has been entered—to file a notice of appeal. *See* Fed. R.App. P. 4(a)(1) (providing that "in a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal ... must be filed with the clerk of the district court within 30 days' after the date of entry of the judgment or order appealed from.").

My conclusion is not undermined by the fact that, as the petitioner observes, Federal Rule of Civil Procedure 6(e) provides that, "[w]henever a party has the right or is required to do some act or take some proceedings within a prescribed period of time after the service of notice or other paper upon the party, and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period." Fed.R.Civ.P. 6(e). As I already have stated, the statute of limitations is tolled for the time period during which a properly filed post-conviction motions is "pending." Whether the petitioner or his attorney received notice of the court's decisions on the relevant motions by mail or otherwise is therefore irrelevant. *Cf. Hatchell v. United States,* 776 F.2d 244, 246 (9th Cir.1985) (holding that Rule 6(e) is inapplicable where the time for filing begins to run on "the date of mailing").

Federal Rule of Civil Procedure 6(a) provides as follows:

> In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period shall be included unless it is a Saturday, Sunday or a legal holiday . . . .

In addition, in *Ross,* the Second Circuit stated as follows: "When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period. Our adoption of a grace period of one year means that petitions filed pursuant to § 2254 and motions filed pursuant to § 2255 are not barred by the statute of limitations established by AEDPA if filed on or before April 24, 1997." *Ross,* 150 F.3d 97, 103 (citations omitted).

Based upon the foregoing, I conclude that, at least where the petitioner is represented by counsel in connection with his post-conviction motions and habeas petition, the dates on which the post-conviction motions are filed are counted towards the statute of limitations, as is the date on which the habeas petition is filed, but the dates on which the relevant decisions with respect to the post-conviction motions are rendered are not.

Here, the statute of limitations began running on April 24, 1996, so the first day counted toward the limitations period is April 25, 1996. The "clock" stopped running 283 days later, on February 1, 1997, the date the petitioner filed his § 440 motion.

The statute of limitations began running again on August 26, 1997, the day after the petitioner was denied leave to appeal the Appellate Division's denial of his § 440 motion, and continued to run through November 11, 1997, the date the petitioner filed his *coram nobis* petition. Thus, during the time period before the petitioner filed his *coram nobis* petition, the statute of limitations ran for 78 days.

The statute of limitations began running for the last time on February 18, the day after the Appellate Division denied the *coram nobis* petition, and ran through February 24, 1998, the date the petition was filed. During this final time period, the statute of limitations ran for 7 days. Taking the three time periods together, the statute of limitations ran for 368 days and, accordingly, the petition is untimely.

The petitioner contends that, notwithstanding the foregoing, I should deem the petition to be timely filed because Rule 6(a) provides that "the last day of the period so computed shall be included unless . . . the act to be done is the filing of a paper in court." According to the petitioner, the foregoing "shows that the day that the various legal proceedings were filed should not be counted." Letter from Joel A. Brenner, Esq., dated July 29, 1998, at 2. In making the foregoing argument, however, the petitioner misreads Rule 6(a), which in fact provides that "the last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, *a day on which weather or other conditions have made the office of the clerk of the district court inaccessible,* in which event the period runs until the end of the next day." Fed.R.Civ.P. 6(a) (emphasis added). The petitioner's counsel has not alleged that he was prevented from filing by bad weather.

The petitioner's counsel also asks that this Court excuse the petitioner's untimely filing

"on the ground that any lateness was due to counsel's misunderstanding of the periods to be included and/or excluded from the statute of limitations." Letter from Joel A. Brenner, Esq., dated July 29, 1998, at 3. The petitioner argues that the uncertainty should be deemed "excusable neglect."

I disagree. In making the foregoing argument, the petitioner appears to be suggesting that, in deciding when to file his two post-conviction motions and the instant petition, his counsel was keeping careful track of how much of the limitations period had run, and that he filed a few days late only because he mistakenly believed that the days on which the post-conviction motions and the instant petition were filed would not count towards the statute of limitations. However, during the time period in which those papers were filed, the district courts within this circuit were determining whether habeas petitions were timely filed by applying the *dicta* laid down in *Peterson v. Demskie*, 107 F.3d 92 (2d Cir.1997). Pursuant to *Peterson*, habeas petitions were timely if they were filed within a "reasonable time" after the effective date of the AEDPA. *Id.* at 93. Accordingly, under *Peterson*, a difference of a few days would almost certainly have made no difference to the question whether the instant petition was timely filed. Indeed, under *Peterson*, this petition most likely would have been dismissed even if it were filed three days earlier than it was. I find the petitioner's claim that his counsel filed several days late as a result of a "miscalculation" to be implausible.[4]

Even excluding allowable time, the petition was filed more than 365 days after the effective date of the AEDPA. I therefore conclude that it was not filed in a timely manner, and that dismissal is warranted on that ground.

## II   *The Merits of the Petition*

Pursuant to the AEDPA, a state prisoner's application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

### A.   *Trial Counsel's Failure to Call Terranova As a Witness*

The petitioner contends that his trial counsel rendered ineffective assistance of counsel by failing to call Terranova as a witness at trial. In its first submission to this Court, the respondent contended that the entire petition must be dismissed because the petitioner has failed to exhaust this argument in state court. In its second submission, it seemed to take a contrary position, arguing that, although it is true that the petitioner has failed to exhaust this claim in state court, he is now procedurally unable to raise it there and therefore is procedurally barred from presenting it to this Court.

In response to the state's arguments regarding exhaustion and procedural bar, the petitioner appears to contend that the claim is exhausted. He further contends that, in any event, he has exhausted his claim that his appellate counsel rendered ineffective assistance of counsel by failing to argue on appeal that, by not calling Terranova, his trial counsel rendered ineffective assistance of counsel.

Pursuant to 28 U.S.C. § 2254(b)(2), I am entitled to deny any unexhausted claims on the merits. As is stated below, the petitioner's claim that his trial counsel rendered ineffective assistance of counsel by failing to call Terranova is without merit; it follows that his claim that his appellate counsel rendered ineffective assistance by failing to raise the issue on appeal is also meritless. Accordingly, the petitioner cannot obtain habeas relief on the ground that his trial counsel should have called Terranova to the stand.

"The two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to habe-

---

4.  I also am unpersuaded by the petitioner's argument that a finding that he failed to timely file violates the Suspension Clause, as I am by his argument that the statute of limitations "stopped" when he filed his first habeas petition with this Court. Oral Argument Tr. 10–12.

as corpus review of ineffective assistance of counsel claims." *Dean v. Superintendent, Clinton Correctional Facility*, 93 F.3d 58, 60 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 987, 136 L.Ed.2d 868 (1997). Under the analysis set forth in *Strickland*, to succeed on an ineffective assistance of counsel claim, the petitioner must demonstrate "that counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052) (emphasis added). The *Strickland* test is used with respect to both ineffective assistance of trial counsel claims and ineffective assistance of appellate counsel claims. *See, e.g., Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.), *cert. denied*, 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). To establish the second prong of the *Strickland* test in the trial context, the petitioner must show that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In the appellate context, the petitioner must establish that "there was a reasonable probability that [his] claim would have been successful before the [state's highest court]." *Mayo*, 13 F.3d at 534 (internal quotations omitted) (citations omitted). The petitioner cannot satisfy the second prong of *Strickland* either with respect to the performance of his trial counsel or with respect to the performance of his appellate counsel.

In assessing the reasonableness of counsel's performance, "judicial scrutiny of counsel's performance must be highly deferential," and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstance, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Here, there is ample reason to conclude that the decision not to call Terranova constituted the exercise of sound trial strategy.

At trial, the prosecution introduced Terranova's grand jury testimony into evidence. In response, the petitioner's counsel presented the testimony of Michelino. Michelino testified that Terranova was outside the nightclub at the time of the stabbing and therefore that Terranova could not have been telling the truth when he testified to the grand jury that he viewed the petitioner stabbing the victim.[5]

If the jury chose to believe Michelino, it could have reached the conclusion that Terranova's testimony was false. Indeed, in his summation, the petitioner's trial counsel relied very heavily on the fact that Terranova's testimony was contradicted by the testimony of Michelino. Trial Tr. 506 ("The cornerstone of [the prosecutor's] case is the testimony of Mr. Terranova, his grand jury testimony, which has been read to you before . . . ."); Trial Tr. 518–19 ("We put one wit-

---

5. Michelino's testimony was as follows:

A. [Terranova, Cristo, and I] were in the parking lot walking towards our car and saw a big commotion, everybody rushing out of the place yelling, screaming. We didn't know what was going on.
Q. And at the time when these people were rushing out of the club where were you in relation to the door of the club?
A. The middle, towards the end of the parking lot.
Q. Up until that time when you, [Terranova] and Cristo were together and saw these people running out of the club, had you seen any disturbance whatsoever inside Players?
A. No, I did not.
Q. At the time when you saw those people, when you and [Terranova] saw those people running out of the club, did you have any idea what had happened inside the club?
A. No, not until a few minutes after. We asked a couple of people around us.
Q. When you say we asked, who are you referring to?
A. Me, Peter Teranova [sic] and Cristo.
Q. After you spoke-you, [Terranova] and Cristo spoke to these other people to find out what had happened inside the club, what did you do then?
A. After we asked them what happened, we heard someone got stabbed and we left after that.
Q. Did you all leave together?
A. Yes, we did.
Q. From the time that you, Peter and Cristo were exiting the club until the time when you observed this commotion going on, the people running outside, was Peter ever outside of your presence?
A. No, we always stuck together.
Trial Tr. 453–55.

ness on. We put Vincent Michelino on the stand .... He told you Peter Teranova [sic] is his good friend.... He tells you that he and Peter Teranova [sic] were together, that when this whole thing occurred, that they were out in the parking lot and he never saw any of this, that Peter was with him at the time and he tells you that he came into this courtroom knowing, knowing that if. he were going to tell the truth, if he were going to get involved, it was going to mean that he was going to have to say Peter Teranova [sic] is a liar. And he came in here, ladies and gentlemen, and despite his reservations and despite his friendship with Teranova [sic], he came in here and he told you just that ...." ).

By contrast, had the petitioner's counsel decided to call Terranova, who was indisputably available to testify for the defense, the jury would of course know that Terranova's trial testimony contradicted the testimony he gave before the grand jury and in separate statements to LaBarbera and the prosecutor. The events giving rise to the *Sirois* hearing would have justified cross-examination into the threats that caused the change in testimony. If the jury reached the conclusion that the change in fact resulted from threats made by the petitioner, it would have had every reason to doubt the testimony of Michelino as well. The risk to the petitioner in calling Terranova at trial was especially acute given his demeanor while testifying at the *Sirois* hearing. After hearing Terranova's testimony there, the trial judge observed that Terranova was "markedly evasive" when testifying that he had not seen who killed Granese and that "his testimony and demeanor clearly conveyed ... that pressures had been bought to bear on him making him unwilling to testify against the [the petitioner]." Respondent's Exhibit B at 11.

Indeed, if the petitioner's trial counsel had called Terranova to the stand, he ran the risk of doing more than undermining Michelino's testimony. Although the prosecution called numerous witnesses who had been present at

Players on the night of the murder, not one of those witnesses identified the petitioner as the killer; rather, they all stated that they had not seen who stabbed Granese. Indeed, at least one of those witnesses testified that, although he had in fact seen the stabbing occur, he nevertheless had been unable to see who the killer was. Trial Tr. 116–19. On several occasions outside the jury's presence, the trial judge expressed his belief that these witnesses were lying when they stated that they had not seen who stabbed Granese. *See, e.g.,* Trial Tr. 410 ("I've had more deaf and blind people come to this court than in all the 30 years I've been here."). The petitioner's attorney may well have concluded that there was a good chance that the jury was having similar doubts about the witnesses' veracity on the subject of identification. Had he called Terranova to the stand, he ran· the risk of turning those doubts into certainties.

Trial counsel's decision not to call Terranova as a witness constituted the trial strategy of an experienced and sought-after criminal defense attorney. The petitioner cannot obtain habeas relief by arguing otherwise.

### B. *The Trial Court's Findings of Fact*

With respect to the trial court's finding that Terranova had been threatened, the petitioner raises three arguments. First, he contends that, in conducting the *Sirois* hearing, the trial court improperly relied upon uncorroborated double and triple hearsay to determine that Terranova was unavailable. Second, he appears to contend that the trial court's finding that Terranova had changed his testimony as a result of threats originating with the petitioner was erroneous. Third, he argues that his appellate counsel rendered ineffective assistance of counsel by failing to argue that the trial court erred in relying on hearsay in finding Terranova to be unavailable.[6]

6. With respect to the petitioner's first two claims, the respondent contends that the petitioner did not raise these claim in his direct appeal. The respondent further contends that, because, pursuant to New York's Criminal Procedure Law § 440.10(2)(c), the petitioner is now unable to raise those claims in state court, he is procedur-

ally barred from presenting them in his habeas petition. The petitioner responds by arguing that he has presented these arguments to the state court via his *coram nobis* petition. I conclude that, in any. event, the petitioner's claims fail on the merits.

1. *The Trial Court's Reliance on Hearsay*

At the *Sirois* hearing, the state presented the testimony of Terranova,[7] Assistant District Attorney Riley, and Detective LaBarbera. The state also presented several audiotapes of telephone conversations Terranova had had with either Riley or LaBarbera, as well as a 911 call from an anonymous source.[8]

Riley testified that, although Terranova voluntarily had approached the police to identify the petitioner as the stabber, he thereafter had expressed fears regarding testifying to that fact before the grand jury. Hearing Tr. 173. Riley further testified that, after Terranova testified before the grand jury, he told Riley that the petitioner had approached him and stated "something . . . to the effect of, 'You were there that night; I want you to come down to my lawyer's with me,'" and that, in response to the foregoing, Terranova had "played it off" by stating to the petitioner that he "[didn't] want anything to do with this, [and was] not going anywhere." Hearing Tr. 182. In addition, Riley stated that, during the same conversation, Terranova had asked Riley about certain difficulties the government had had with the petitioner's pre-trial electronic monitoring. Hearing Tr. 183.

In addition to the foregoing, Riley further testified that Terranova had informed him that a friend, whom Terranova would not name, had approached Terranova and showed him a copy of the form the police filled out after Terranova made his statement identifying the petitioner as the man who stabbed Granese. Hearing Tr. 189–90. Upon showing the form to Terranova, the friend had stated " 'This is you, isn't it?' " Hearing Tr. 190. According to Riley, Terranova stated that the form he saw had been redacted; Riley further testified that, in accordance with a court order, he previously had given a redacted copy of that form to petitioner's attorney. Hearing Tr. 191.

Riley further testified that Terranova had informed him that the person who showed him the form stated that he did so because he was attempting to "intervene[ ] on his behalf with people that were, in his words, coming to break his legs." Hearing Tr. 189. Riley stated that Terranova had informed him that the same unidentified friend had gone to Harlem to see the petitioner's uncle "in connection with [Terranova] not testifying at trial" and "in connection with . . . the payment of money." Hearing Tr. 224–26. In addition, according to Riley, Terranova informed him that, after he left New York in January of 1992, he had taken money from "the defense" in order to stay away from New York. Hearing Tr. 195.[9]

The petitioner is correct in noting that, in deciding that Terranova had changed his testimony as a result of threats which originated with or were authorized by the petitioner, the trial court relied at least in part on multiple levels of hearsay. However, the Constitution does not prohibit a trial court's reliance on hearsay evidence in making an initial determination regarding the admissibility of evidence. *See United States v. Mas-*

---

7. In his testimony, Terranova stated that, although it was true that he had testified in the grand jury that he had seen the petitioner stab Granese, upon further reflection he had reached the conclusion that he had not in fact witnessed the stabbing. *See, e.g.,* Hearing Tr. 81–82 (stating that, when he went to the police to identify the petitioner as the stabber, he "went down there to say that [he] saw something"; that "when [he] spoke to the detectives . . . [he] had said that [he] wasn't sure of who it was that stabbed Anthony"; that the detectives informed them that other witnesses had identified the petitioner as the stabber; and that, although "[he] had been drinking that night, . . . there were a lot of things going on, [and] it happened fast," after talking to the police he became convinced that the petitioner was the stabber); Hearing Tr. 92 (stating, in response to Assistant District Attor-

ney's query as to why he left his job suddenly in January of 1992, that he had left because he "found out that this case was coming up" and "realized that [he] wasn't sure of what [he] saw").

8. The audiotapes were not transcribed and, accordingly, I am unable to review them. Nevertheless, the trial court quotes portions of the tapes in his memorandum opinion. *See* Respondent's Exhibit B.

9. In his testimony, Detective LaBarbera corroborated much of what was said by the Assistant District Attorney. For example, the detective stated that Terranova had informed him that he had seen a redacted copy of his statement. Hearing Tr. 251–57.

*trangelo*, 693 F.2d 269, 273 (2d Cir.1982).[10] Indeed, as the trial judge observed, successful witness intimidation would often not be provable at all if hearsay were not permitted. Respondent's Exhibit B at 3 n. 2. That some of the hearsay elicited at the *Sirois* hearing had multiple levels (*e.g.*, Terranova's statement to law enforcement of statements made to Terranova by an unidentified third-party), bears only on the weight of such evidence, not its admissibility for the purposes of the hearing.

### 2. The Trial Court's Finding that Terranova Was Unavailable

█ The petitioner also appears to contend that the trial court's finding that the petitioner was responsible for Terranova's decision to change his testimony was erroneous. According to the petitioner, the evidence introduced at the *Sirois* hearing was not sufficient to support a finding that any of the threats originated with or were condoned by the petitioner.

On habeas review, findings of fact made by state court judges are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."). The petitioner can overcome that presumption only with "clear and convincing evidence." *Id.* ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

It is true that certain of the threats related by Terranova were not directly attributed to the petitioner. For example, Terranova was informed by a friend that certain people were threatening to break Terranova's legs, but Terranova did not state that the friend had informed him that those threats originated with, or were condoned by, the petitioner. Similarly, Terranova did not state that the friend informed him that the petitioner had anything to do with the petitioner's uncle's offer to pay Terranova to change his testimony, or with the money that Terranova eventually received.

I nevertheless conclude that there was ample evidence to support the trial court's finding. The petitioner was the obvious beneficiary of the successful effort to silence Terranova. The trial court could justifiably have concluded that the petitioner's invitation of Terranova to the petitioner's lawyer's office was an effort to intimidate. Standing alone, such conduct may be innocuous, but a factfinder is not required to view it in isolation. Other evidence supported the conclusion that defense counsel was used (perhaps unwittingly) to facilitate the intimidate. Specifically, the unnamed friend who conveyed a threat of physical violence to Terranova came armed with a copy of the redacted police report of Terranova's statement that had been provided to the petitioner's attorney. Also, the petitioner's encounter with Terranova occurred at approximately the same time as the grand jury minutes of Terranova's testimony were discovered to be missing.

Similarly, the fact that efforts to buy Terranova's silence (as opposed to obtaining it by intimidation) were attributed to the petitioner's uncle did not require a trial judge to ignore them. Judges, like jurors, are permitted to use their common sense in drawing inferences. Here, an eyewitness to a murder suddenly got "amnesia," quit a well-paying job, and left his home shortly before the trial. Once found, he confessed his fear to the authorities and attributed it to conduct by the petitioner and others who acted in ways that assisted the petitioner, including his uncle. Finally, when called at the *Sirois* hearing, a visibly dishonest Terranova provided an incomprehensible explanation for his changed testimony. Under such circumstances, the trial court properly found that Terranova changed his testimony as a result of threats that originated with or were condoned by the petitioner. The petitioner has not overcome the presumption of correctness enjoyed by that finding. Nor has he shown that the state adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

---

**10.** Indeed, the petitioner's attorney did not even object to the introduction of the hearsay.

### 3. Ineffective Assistance of Appellate Counsel

The petitioner also suggests that his appellate counsel rendered constitutionally ineffective assistance by failing to argue that the admission of hearsay at the *Sirois* hearing violated state law. As stated above, in order to succeed on a claim of ineffective assistance of appellate counsel, the petitioner must show both "that counsel's conduct fell below an objective standard of reasonableness," *Dean,* 93 F.3d at 60, and that "there was a reasonable probability that [his] claim would have been successful before the [state's highest court]," *Mayo,* 13 F.3d at 534 (internal quotations omitted) (citations omitted). I find that the petitioner can satisfy neither prong of *Strickland.*

■ "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also id.* at 753, 103 S.Ct. 3308 ("A brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."). Accordingly, in reviewing appellate counsel's performance, I must do more than merely determine whether counsel omitted a nonfrivolous argument. *See id.* at 754, 103 S.Ct. 3308; *Mayo,* 13 F.3d at 533. Rather, in judging a claim that counsel failed to raise a viable issue, I am required to " 'examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal.' " *Id.* (citation omitted). I must then proceed to compare the " '[s]ignificant issues which could have been raised ... to those which were raised.' " *Id.* (citation omitted). The presumption of effective assistance of counsel will be overcome " 'only when ignored issues are clearly

stronger than those presented.' " *Id.* (citation omitted).

■ In his appeal to the Appellate Division, the petitioner argued that the trial court committed reversible error by allowing the prosecution to introduce Terranova's grand jury testimony as part of its case-in-chief and by permitting testimony regarding the crimes allegedly committed by the petitioner's brother. The petitioner also argued that the sentence imposed by the trial court was excessive. *See* Respondent's Exhibit D. After the Appellate Division denied all three claims, the petitioner sought and was granted leave to appeal the Appellate Division's decision to the New York Court of Appeals. In his brief to the Court of Appeals, the petitioner presented his claims regarding trial error. *See* Respondent's Exhibit G.[11] The Court of Appeals rejected the first and declined to rule on the second claim on the ground that the petitioner had failed to preserve it for review.

It is true that the New York Court of Appeals has yet to address the issue of whether a trial court can rely upon hearsay in conducting a *Sirois* hearing. Nevertheless, at the time that the hearing in the instant action was conducted, lower New York courts explicitly had held that such reliance is appropriate. *See People v. Banks,* 146 Misc.2d 601, 551 N.Y.S.2d 1011, 1012 n. * (Sup.Ct.1989) ("Hearsay testimony was received at this hearing because such evidence is admissible at a pretrial hearing which is held to determine the admissibility of evidence at trial."); *People v. Sweeper,* 122 Misc.2d 386, 471 N.Y.S.2d 486, 487 (Sup. Ct.1984) ("Here, as a result of a showing by the People of a factual basis which distinctly suggested that the defendant had been involved in the death of the witness, I held an extended evidentiary hearing. At the hearing hearsay evidence was received.").[12] Moreover, under New York law, a court

---

**11.** The New York Court of Appeals may not review a claim that a sentence was excessive. *See People v. Miles,* 61 N.Y.2d 635, 471 N.Y.S.2d 849, 459 N.E.2d 1286 (1983).

**12.** I recognize that the Second Circuit has ruled that "the attorney's omission of a meritorious claim cannot be excused simply because an inter-

mediate appellate court would have rejected it." *Mayo,* 13 F.3d at 533–34. My conclusion that appellate counsel did not render ineffective assistance of counsel by failing to raise the hearsay argument is based on my conclusion that, relatively speaking, that argument was weaker than those which were raised.

may rely upon hearsay in conducting a suppression hearing. *See* New York's Criminal Procedure Law § 710.60(4) (where a court conducts a hearing to determine whether evidence should be suppressed, "hearsay evidence is admissible to establish any material fact"). Finally, there is no question that hearsay may be admitted during the federal equivalent of a *Sirois* hearing. *See Mastrangelo*, 693 F.2d at 273. Given the foregoing, a claim that the trial court should not have relied upon hearsay testimony in conducting the *Sirois* hearing, though perhaps not frivolous, was not a particularly strong argument.

By contrast, the trial court's decision to allow the prosecution to introduce, as part of its case-in-chief, the grand jury testimony of a witness who was willing to testify was, at the time, a far more controversial proposition under state law, especially given that, under New York law, grand jury testimony generally may not be admitted for its truth. Moreover, there existed a number of New York cases holding that evidence of criminal acts by persons associated in some way with

the defendant on trial is unduly prejudicial.[13] Accordingly, the petitioner's argument that the trial court erred in permitting testimony regarding crimes committed by the petitioner's brother also was stronger than his claim that the trial court improperly relied upon hearsay in conducting the *Sirois* hearing.[14] I therefore conclude that the petitioner has failed to overcome the presumption that his appellate counsel rendered constitutionally effective assistance.

Nor can the petitioner satisfy the second prong of *Strickland*. It is true that the New York Court of Appeals has yet to rule on the question whether hearsay is admissible at a *Sirois* hearing. However, as already stated, a number of federal and state courts have held that it is.[15] The petitioner has presented nothing which would suggest that the Court of Appeals would disagree with those courts which have held that such reliance is appropriate.[16]

I conclude that the petitioner has satisfied neither prong of *Strickland*. With respect to the petitioner's claim that his appellate counsel rendered constitutionally ineffective assis-

---

**13.** *See, e.g., People v. Lyons*, 106 A.D.2d 471, 482 N.Y.S.2d 567, 569 (2d Dep't 1984) (holding that the defendant received an unfair trial in part because "[t]he prosecutor ... elicited testimony about a getaway car that was owned by a suspected accomplice" even though "[t]here was nothing to link that car to defendant" and stating that "[s]uch a use of irrelevant evidence is not to be condoned, especially where it has prejudicial potential"); *People v. Tucker*, 102 A.D.2d 535, 477 N.Y.S.2d 386, 388–89 (2d Dep't 1984) (finding that, at trial where "[t]he only questions before the jury were whether defendant possessed a sawed-off shotgun on the date in question, and whether that shotgun was capable of being concealed," it was "unduly prejudicial" to allow "testimony regarding observations or seizures of weapons in the sedan, because such testimony was totally irrelevant to the issues in the case and was not so inextricably interwoven with relevant evidence of defendant's possession of a shotgun as to require its inclusion"); *People v. Spencer*, 67 A.D.2d 867, 413 N.Y.S.2d 395, 396 (1st Dep't 1979) ("Inasmuch as a great deal of evidence concerned the relationship of Spencer and Williams and the crimes they were accused of, it is conceivable that the jury's evaluation of the innocence or guilt of the appellant would be influenced by the weight of evidence against his co-defendant, to his prejudice.").

**14.** In addition, the Appellate Division has on a number of occasions reduced a sentence on the ground of excessiveness. *See, e.g., People v. Rol-*

*dan*, 222 A.D.2d 132, 647 N.Y.S.2d 179, 184 (1st Dep't 1996).

**15.** Moreover, in ruling on the petitioner's *coram nobis* petition, which included the claim that appellate counsel provided ineffective assistance by failing to raise the question whether the trial court properly relied upon hearsay in conducting the *Sirois* hearing, the Appellate Division explicitly stated that the petitioner "ha[d] failed to establish that he was denied the effective assistance of counsel." Although, in so ruling, the Appellate Division did not state whether it based its holding on the first or second *Strickland* prong, its decision was no doubt informed by its conclusion that, as a matter of state law, the petitioner's claim lacked merit. To the extent that is true, I am bound by the decision of the Appellate Division on the merits of the admission of hearsay at a *Sirois* hearing, since that is purely a question of state law. *Cf. Parron v. Quick*, 869 F.2d 87, 90 (2d Cir.), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 127 (1989).

**16.** The mere fact that, in denying the petitioner's claims on appeal, the Court of Appeals explicitly stated that the petitioner had failed to preserve his hearsay claim on appeal, *see Geraci*, 625 N.Y.S.2d at 475 n. 4, 649 N.E.2d 817, is not evidence that, had that claim been preserved, the Court of Appeals would have ruled in the petitioner's favor.

tance by failing to argue that the trial court impermissibly relied on hearsay in conducting the *Sirois* hearing, the petition is denied.

### C. The "Availability" of Terranova

The petitioner further contends that the trial court violated the Confrontation Clause of the Sixth Amendment when it allowed the prosecution to introduce Terranova's grand jury testimony as part of its case-in-chief. In so arguing, the petitioner acknowledges that it is well established that, where a defendant procures the silence of an adverse witness, "whether by chicanery, actual violence or murder," the Constitution does not prevent a trial court from holding that a defendant "cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him." *Mastrangelo*, 693 F.2d at 272 (citations omitted). The petitioner nevertheless argues that the foregoing principle does not apply to the facts of the instant case because Terranova explicitly stated to the trial court that he was ready, willing, and able to testify at trial (albeit differently than he had testified before the grand jury). According to the petitioner, the trial court violated his Confrontation Clause rights by finding legally unavailable a witness who was actually available.

I conclude that the petitioner's Confrontation Clause claim lacks merit and that, in any event, he waived his Confrontation Clause objections.

### 1. Whether the Petitioner's Confrontation Clause Rights Were Violated

In *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court set forth "a general approach" for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. It held that the Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay." *Id.* "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ..., the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the

defendant." *Id.* Second, if the witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.* at 66, 100 S.Ct. 2531.

### a. Unavailability

■ The Supreme Court further elaborated on the requirement of a showing of unavailability in *United States v. Inadi*, 475 U.S. 387, 390, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). In that case, the Court held that, in order to introduce the out-of-court statements of a co-conspirator which were made during the course of and in furtherance of the conspiracy, the prosecution need *not* first prove the unavailability of the co-conspirator. In so ruling, the Court acknowledged that, in *Roberts*, it had suggested that the Confrontation Clause required the prosecution to prove the unavailability of a witness before introducing prior testimony given by that witness. The Supreme Court held, however, that there exists a distinction between prior testimony and a statement made during the course of a conspiracy. *See Inadi*, 475 U.S. at 394, 106 S.Ct. 1121. With respect to prior testimony, the Court noted as follows:

> There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirator's out-of-court statements. Unlike some other exceptions to the hearsay rules ..., former testimony often is only a weaker substitute for live testimony. It seldom has any independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to the Confrontation Clause analysis, favor the better evidence.

*Id.* The Court went on to state that the "same principles do not apply to co-conspirator statements." *Id.* According to the Court:

Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court.... Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand. Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy.

In addition, the relative positions of the parties will have changed substantially between the time of the statements and the trial. The declarant and the defendant will have changed from partners in an illegal conspiracy to suspects or defendants in a criminal trial, each with information potentially damaging to the other .... In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force.

*Id.*

After drawing the foregoing distinction between prior testimony and the statements of co-conspirators, the Court went on to note that, with respect to the latter, "[t]here appears to be little, if any, benefits to be accomplished by the ... unavailability rule." *Id.* at 396, 106 S.Ct. 1121. In support of that statement, the Court noted that, "if the declarant either is unavailable, or is available and produced by the prosecution, the statements can be introduced anyway." *Id.* The Court further stated that "an unavailability rule is not likely to produce much testimony that adds anything to the 'truth-determining process' over and above what would be produced without such a rule." *Id.* The Court noted that:

Some of the available declarants already will have been subpoenaed by the prosecution or the defense, regardless of any Confrontation Clause requirements. Presumably only those declarants that neither side believes will be particularly helpful will not have been subpoenaed as witnesses.... If

the Government has no desire to call a co-conspirator declarant as a witness, and if the defense has not chosen to subpoena such a declarant, ... then it is difficult to see what, if anything, is gained by a rule that requires the prosecution to make that declarant "available."

*Id.* at 397–98, 106 S.Ct. 1121.

In the instant case, the out-of-court statements at issue were made in the course of a prior judicial proceeding. In addition, as the petitioner points out, Terranova was not "actually" unavailable: at the *Sirois* hearing, he informed the trial judge that he was ready, willing, and able to testify. I nevertheless conclude that the question whether Teranova was "unavailable" is properly analyzed under the reasoning set forth in *Inadi,* and therefore that the admission of Terranova's grand jury testimony did not violate the Confrontation Clause.

As the Supreme Court stated in *Inadi,* the cases involving prior testimony "rest[ ] in part on the strong similarities between the prior judicial proceedings and the trial." [17] Where the prosecution seeks to introduce the prior testimony of a witness, a finding of unavailability is required because, generally speaking, the jury receives the same information whether it is presented with it via a witness's live testimony or via the witness's former testimony. When given the choice, live testimony is "better evidence" than is former testimony. In the instant case, however, the foregoing principle does not apply: Terranova did not intend to give the same testimony at trial as he did before the grand jury. Accordingly, Terranova's grand jury testimony was valuable whether or not Terranova was called to the witness stand during trial.

Nor would the "truth-determining process" have been aided to any meaningful degree had the trial court required the prosecutor to call Terranova to the stand. It is true that, at the *Sirois* hearing, Terranova informed the trial court that, if called, he would state that he did not know who killed Granese. It is also true, however, that, if the prosecution had been required to call Terranova, and if,

---

**17.** *Id.* at 395.

upon being called, Terranova had stated that he did not know who killed Granese, the Constitution would not have prevented the prosecutor from introducing Terranova's grand jury testimony into evidence. Accordingly, regardless of whether Terranova was called to the stand, the jury would have been made aware of the fact that, at one time, Terranova had identified the petitioner as the man responsible for the death of Granese.

I do not mean to suggest that a witness becomes legally "unavailable" whenever it can be established that his prior testimony differs materially from his expected testimony at trial. There are no doubt innumerable settings in which the truth-finding process benefits from requiring such a witness to be produced and cross-examined with regard to such differences. However, in rejecting an unavailability argument in *Inadi*, the Supreme Court recognized that intervening events can so alter the position of the declarant that the evidentiary significance of his prior statements cannot be recaptured. I conclude that the intimidation of the witness into a wholesale rejection of his prior testimony is such an event.

I recognize that the jury at the petitioner's trial was made aware only of the fact that Terranova had identified the petitioner as the murderer, and was not made aware of the arguably exculpatory fact that Terranova had since changed his testimony. Accordingly, here, the petitioner did not in fact "confront" Terranova. However, the responsibility for that fact falls more properly on the petitioner himself, and not on the trial court. Had he desired to do so, the petitioner could have called Terranova to the stand so that Terranova could testify that his prior identification of the petitioner as the killer was false.[18] Indeed, as I already have stated, his decision not to call Terranova was the result of the exercise of trial strategy.

b. *The Reliability of Terranova's Grand Jury Testimony*

The Confrontation Clause also requires a showing that the hearsay bears adequate indicia of reliability. According to the Supreme Court, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. Grand jury testimony does not fall within a firmly rooted hearsay exception. Accordingly, I must determine whether Terranova's grand jury testimony enjoyed particularized guarantees of trustworthiness. I conclude that it did.

According to the Supreme Court, "'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must ... be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). "[E]vidence admitted [pursuant to a finding that it enjoys particularized guarantees of trustworthiness] must ... be so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821, 110 S.Ct. 3139. Accordingly, "unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.*

In concluding that the People could introduce the grand jury testimony of Terranova, the trial judge held that the grand jury testimony "had sufficient indicia of reliability." Respondent's Exhibit B at 25–26. In support of that conclusion, the trial judge noted as follows:

> Terranova gave his testimony under oath to an objective body. He had personal knowledge of the facts as indicated by the detailed accounts he gave to the police, the assistant district attorney and the Grand Jury. He was merely a witness to the incident and not a participant. He knew both the defendant and the victim prior to the incident, and his 10–year acquaintance

---

**18.** By arguing that his attorney rendered constitutionally ineffective assistance by not calling Terranova to the stand, the petitioner himself has conceded that it was within his power to do so.

with the defendant was of considerably longer duration than the brief period he had known the deceased, who was also just an acquaintance. Respondent's Exhibit B at 26. In addition, Terranova's identification of the petitioner had the attribute of spontaneity; in an anonymous 911 call made that very night (which, despite Terranova's eventual denial, the trial court found to have been made by the petitioner), the petitioner was identified as the man who stabbed Granese.

The state court's finding that Terranova's grand jury testimony enjoyed sufficient indicia of reliability was not "contrary to, [nor did it involve] an reasonable application of, clearly established federal law." [19] Accordingly, I decline to disturb it. See United States v. McHan, 101 F.3d 1027, 1036–38 (4th Cir.1996) (upholding trial court's decision to admit into evidence the grand jury testimony of a co-conspirator who had died before trial because trial court did not err in finding witness to be unavailable or in finding that testimony enjoyed adequate indicia of reliability), cert. denied, —— U.S. ——, 117 S.Ct. 2468, 138 L.Ed.2d 223 (1997); see also Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir.) ("The [AEDPA] commands deference to the state court's judgment by using the word 'unreasonable,' which is stronger than erroneous and may be stronger than clearly erroneous."), cert. denied, —— U.S. ——, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997).

In addition, my independent examination of Terranova's grand jury testimony indicates that it enjoyed sufficient indicia of reliability both for the reasons given by the state court judge and because, as the trial court explicitly found, Terranova "confided his fears about being seen testifying before the Grand Jury to the detective and the assigned assistant." Respondent's Exhibit B

at 16–17. But see United States v. Fiore, 443 F.2d 112, 115 & n. 3 (2d Cir.1971) (holding that, where witness refused to take the oath and testify, his grand jury testimony should not have been admitted because he was not subject to cross examination before the grand jury).

In any event, as I already have stated, the petitioner was given the right to call Terranova to the stand himself. Accordingly, had he desired to "confront" Terranova's grand jury testimony, he could have done so. That fact alone lends his grand jury testimony sufficient indicia of reliability. See also United States v. Insana, 423 F.2d 1165, 1168 (2d Cir.1970) ("[N]or does the failure of the defendant to cross-examine because he believes such examination would be fruitless render the witness unavailable for such examination."), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970).[20]

In sum, I conclude that the prosecution did not have to show the unavailability of Terranova before presenting his grand jury testimony. I further conclude that the totality of the circumstances surrounding Terranova's testimony in front of the grand jury show that his testimony enjoyed sufficient indicia of reliability and that, in any event, the fact that the petitioner could have called Terranova to the stand to "confront" him with respect to his grand jury testimony lends that testimony adequate indicia of reliability.

2. *The Petitioner's Waiver of His Confrontation Clause Rights*

■■■ I further conclude that, regardless of whether the introduction of Terranova's grand jury testimony satisfied the requirements of the Confrontation Clause, the petitioner waived his rights under the Confrontation Clause.

---

19. I have already found that the "historical facts" as found by the trial court in his memorandum decision are entitled to a presumption of correctness, one which the petitioner has not overcome. See supra Part II.B.2.

20. Moreover, the Supreme Court's opinion in *Inadi* makes clear that the fact that, had the petitioner called Terranova to the stand to elicit his exculpatory testimony, the petitioner would have been "confronting" a witness he himself called, rather than a witness called by the prose-

cution, makes no difference to the analysis under the Confrontation Clause. See *Inadi*, 475 U.S. at 397, 106 S.Ct. 1121 ("Neither the Government nor the defense originally subpoenaed Lazaro as a witness.... If respondent independently wanted to secure Lazaro's testimony, he had several options available, particularly under Federal Rule of Evidence 806 which provides that if the party against whom a co-conspirator statement has been admitted calls the declarant as a witness, 'the party is entitled to examine him on the statement as if under cross-examination.' ").

In *Mastrangelo,* the Second Circuit held that, where, in anticipation of a witness's testimony, the defendant obtains that witness's actual unavailability, he thereby waives his right to cross-examine that witness. *See Mastrangelo,* 693 F.2d at 272 ("If Mastrangelo was involved in [the witness's] death, his involvement waived his confrontation clause objection to the admission of [the witness's grand jury] testimony."). In that case, the witness whose grand jury testimony was at issue was on his way to the courthouse to testify against the defendant when he "was chased by two men and was shot dead in the street." *Id.* at 271. After granting a mistrial and denying the defendant's motion to bar re-prosecution on the basis of the double jeopardy clause, Judge Weinstein stated that " '[he] was under the distinct impression, and [he] believe[d] that by a preponderance of the evidence ... [he] was warranted in finding that th[e] defendant Mastrangelo, either directly arranged for the killing of the witness or was advised of the possible killing of the witness and acquiesced.' " *Id.* (quoting the district judge). Based upon the foregoing, the Second Circuit held that Judge Weinstein's finding "raise[d] an issue as to whether Mastrangelo waived his sixth amendment rights and, a fortiori, his hearsay objection." *Id.* at 272. The court further stated that, "[i]f Mastrangelo was involved in [the witness's] death, his involvement waived his confrontation clause objections to the admission of [the witness's] testimony." *Id.* After so stating, the court remanded the case so that the district court could conduct a hearing with respect to the question whether Mastrangelo had, in fact, been involved in the witness's death.

Here, the trial court, after conducting a hearing, found that the petitioner, by means of threats, had convinced Terranova to change his testimony. I conclude that, by so doing, the petitioner waived his Sixth Amendment rights with respect to Terranova's testimony. *See id.*

The fact that the petitioner did not prevent Terranova from providing any testimony at all does not change this result. To hold otherwise would be to reward the defendant who, instead of killing a witness or convincing the witness not to testify at all, instead convinces the witness to perjure himself on the stand. Indeed, in the instant case, the petitioner was in a better position than was the defendant in *Mastrangelo.* In *Mastrangelo,* the defendant was confronted with the grand jury testimony of a deceased witness and, as a result, he could not call that witness to the stand to "confront" his grand jury testimony; by contrast, in the instant case, the petitioner was in the far superior position of being able to elicit Terranova's exculpatory testimony if he thought it was in his best interests to do so. It follows that, if it would not have been error to introduce the grand jury testimony of the witness in *Mastrangelo* upon a finding that Mastrangelo had been "involved in [the witness's] death," it certainly was not error for the trial court in this case to have allowed the introduction of Terranova's grand jury testimony upon a finding that the petitioner had convinced Terranova to perjure himself if called at trial.

For the foregoing reasons, I conclude that the introduction of Terranova's grand jury testimony as part of the prosecutor's case-in-chief did not violate the petitioner's Sixth Amendment rights.

### D. The Evidence of Bad Acts Committed by the Petitioner's Brother

In his grand jury testimony, which was read to the jury at trial, Terranova stated that he had seen the petitioner's brother, Paul Geraci, fire shots into the crowd in the parking lot after Granese was stabbed. In his habeas petition, the petitioner contends that "[t]he acts of petitioner's brother were admitted into evidence over objection, despite the fact that the petitioner was not charged with those acts, thus depriving petitioner of his Federal Constitutional right to a fair trial and due process of law." I shall address this issue despite the fact that the petitioner did not brief it in his memorandum of law and the respondent has failed to address it.

Although the petitioner raised this argument in his appeal to the New York Court of Appeals, that court denied the claim on the ground that the argument "was not preserved by a sufficiently specific objection." *See Geraci,* 625 N.Y.S.2d at 476, 649 N.E.2d 817. Moreover, the petitioner did not pres-

ent this claim in either of his two post-conviction motions. Accordingly, he has not exhausted this claim. I am, however, entitled to deny the petitioner's claim on the merits notwithstanding the petitioner's failure to exhaust. *See* 28 U.S.C. § 2254(b)(2).

▇ Petitioner appears to contend that the trial court's decision to allow testimony regarding the bad acts committed by his brother was erroneous because his brother's behavior was both irrelevant and unduly prejudicial. Generally, erroneous evidentiary rulings by a state trial court do not rise to the level of a constitutional violation upon which a writ of habeas corpus may be issued. *See Jenkins v. Bara*, 663 F.Supp. 891, 899 (E.D.N.Y.1987). A petitioner bears the "heavy burden" of establishing that the evidentiary error constituted a deprivation of a constitutionally recognized right such as the right to a fair trial. *See Roberts v. Scully*, 875 F.Supp. 182, 189 (S.D.N.Y.1995). "The erroneous admission of evidence rises to a deprivation of due process under the Fourteenth Amendment only if the evidence in question 'was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992) (quoting *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985)). I find that petitioner has not satisfied these standards.

▇ Trial courts are given "broad discretion" in determining the relevancy and admissibility of evidence. *See DeLuca v. Lord*, 858 F.Supp. 1330, 1362 (S.D.N.Y.1994); *see also United States v. Smith*, 727 F.2d 214, 220 (2d Cir.1984). Here, the trial court did not abuse that discretion. The conduct of Paul Geraci was simply not an unrelated crime. To the contrary, it was integrally related to the crimes for which the petitioner was tried and convicted. In the petitioner's effort to escape the nightclub and the gathering of Granese's friends outside the nightclub, the petitioner's brother Frank helped by driving the getaway car, while Paul helped by firing a shot into the crowd. The trial court properly admitted this facet of Terranova's testimony because it completed the picture of the events that occurred at the nightclub when Granese was killed.

Nor has petitioner demonstrated that the evidentiary ruling was sufficiently material to provide the basis for his conviction or to remove a reasonable doubt that would have existed on the record without it. *See Johnson*, 955 F.2d at 178. Even if the evidence of the bad acts committed by the petitioner's brother had not been admitted, there is little question that the jury would have reached the same conclusion with respect to the petitioner's guilt, and the petitioner has made no showing to the contrary.

Petitioner has not demonstrated that the trial court's decision to admit the uncharged crime evidence was erroneous. Furthermore, petitioner has not shown that the alleged error was sufficiently material to provide the basis for his conviction or to remove a reasonable doubt that would have existed on the record without it. His claim that the court erred in allowing testimony regarding the actions of his brother is without merit.

### E. The Petititioner's Sentencing

At the petitioner's sentencing, the prosecutor argued that, although the probation report stated that the petitioner had no criminal record, the prosecutor believed that statement to be "not ... entirely correct." Sentencing Tr. 15–16. He went on to describe various uncharged crimes and bad acts which he alleged that the petitioner had committed and to ask the court to take those crimes and bad acts into consideration when sentencing the petitioner. Sentencing Tr. 16–22. In describing the various crimes, the ADA noted that he believed that the petitioner had, in the past, been treated with a great deal of leniency. Sentencing Tr. 18.

After the prosecutor made the foregoing statements, the court asked the petitioner's attorney whether he desired to make a statement. Sentencing Tr. 23. The petitioner's counsel stated that he did; he then noted that the alleged crimes and bad acts spoken about by the prosecutor were not contained in the probation report. The petitioner's attorney contended that, if the court were going to sentence the petitioner based upon those incidents, he "would have expected [to] have gotten something ... so that we could have prepared for that." Sentencing Tr. 23.

In response, the trial court stated that he had "prepared [his] sentence before he heard it." Sentencing Tr. 23.

Thereafter, the petitioner's counsel proceeded to make a statement. In the course of that statement, counsel stated that, "[a]s far as remorse is concerned, Judge, Mr. Geraci has maintained his innocence from the very beginning. The position he's taken that was the position he took during trial. The jury found otherwise, as the Court is well aware, and has spoken to earlier this afternoon. We fully intend to appeal that jury's verdict. For him to be making statements to the Probation Department under those circumstances would not be appropriate." Sentencing Tr. 25–26.

When the petitioner's counsel finished his statement, the Court Clerk asked the petitioner "whether [he wished] to say anything on [his] own behalf with respect to sentence." Sentencing Tr. 28. After the petitioner stated that he did not wish to say anything, the trial court imposed sentence. In so doing, the court stated as follows:

And when Mr. Geraci tells the Probation Department I wasn't even there, I don't know what this case is all about. I don't know where he was, but I heard the story here that Mr. Geraci was involved in an altercation at the Player's Bar or Restaurant. As he was running out, his brother, Paul, fired a gun, okay? Paul says he was there. Paul says he had a gun at one o'clock in the morning in front of Player's Bar. I mean, who are you kidding? Even if he said I don't want to talk to the Probation Department, I would accept that a lot more than his saying I didn't even know what this case was about, I wasn't there.

Sentencing Tr. 29.

Based upon the foregoing events, the petitioner contends that "a number of his Federal Constitutional rights were violated during his sentence proceeding." Petitioner's Memorandum at 28. Specifically, the petitioner contends that his petition for habeas review should be granted because (1) the prosecutor's statements constituted material misinformation; (2) even assuming the accuracy of the information, its introduction at the sentencing hearing without prior notice to defense counsel deprived the petitioner of the effective assistance of counsel; (3) the prosecutor did not discharge his obligation of proving that the petitioner had committed the uncharged bad acts and crimes; and (4) the prosecutor improperly urged the court to increase his sentence in an effort to rectify a perceived leniency in prior sentences.

■ As the petitioner himself notes, in response to his counsel's objection to the prosecutor's mention of prior uncharged crimes and bad acts committed by the defendant, the judge stated that he had "prepared his sentence before" hearing about those incidents. In so stating, the judge clearly indicated that, in imposing the petitioner's sentence, he would not consider the uncharged crimes and prior bad acts which the prosecutor alleged the petitioner had committed. Accordingly, the petitioner cannot succeed on his claim that the prosecutor's statements constituted material misinformation, that their introduction at the sentencing hearing without prior notice to defense counsel deprived the petitioner of the effective assistance of counsel, that the prosecutor did not prove that the petitioner had committed the alleged acts, or that the prosecutor improperly urged the court to increase his sentence in an effort to rectify a perceived leniency in prior sentences.

■ The petitioner also contends that the prosecutor improperly urged the court to increase the petitioner's sentence for failure to show remorse for his crimes and that, in imposing sentence, the judge did just that. In support of his contention, the petitioner maintains that "[t]he entire tenor of the prosecutor's remarks at sentence made it clear that he was asking for an enhanced sentence because, among other things, petitioner has not shown any remorse" and contends that "[t]he sentencing judge's sole response was that petitioner's claim of innocence was contradicted by other evidence the judge had heard." Petitioner's Memorandum at 37. According to the petitioner, the foregoing infringed upon his Fifth Amendment right to remain silent.

I disagree. A sentencing judge may properly consider a defendant's remorse, or lack thereof, in determining a sentence. Doing so

does not infringe a defendant's Fifth Amendment rights.

▮▮▮▮ Finally, the petitioner contends that, by stating that he had prepared the petitioner's sentence before hearing the prosecutor's statement, the judge revealed that he had determined the petitioner's sentence before the petitioner exercised his constitutionally mandated right to speak before sentence is determined. I disagree.

There are two possible interpretations of the judges statement that he had "prepared" the petitioner's sentence before hearing the prosecutor's statement. The first, which is urged by the petitioner, is that, in so stating, the judge revealed that he had decided the term to which the petitioner would be sentenced prior to hearing from the petitioner. The second, more benign, interpretation is that the judge had "prepared for" the sentence: he had, in other words, done those tasks which a judge must do before imposing a sentence, including, for example, reading the probation report, considering the crimes of which the defendant had been convicted, and determining the range of imprisonment which accompanies those crimes. Pursuant to the latter interpretation, the judge *prepared for* his sentence prior to hearing from the petitioner, but did not *finalize* his sentence until afterwards.

"[W]here the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one." *Wainwright v. Witt*, 469 U.S. 412, 431, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Here, the sentencing judge is presumed to have been aware that the petitioner had a right to speak prior to being sentenced and to have conducted himself accordingly. The petitioner has pointed to no evidence which would support a contrary conclusion.

I perceive no constitutional error on the part of the sentencing court. To the extent that the petitioner seeks relief on the ground

that such error occurred, his petition is denied.

F. *Whether the Petitioner's Appellate Counsel Suffered from a Conflict of Interest*

The petitioner's final contention is that his appellate counsel was unable to render constitutionally effective assistance because he suffered from a conflict of interest. Specifically, the petitioner notes that appellate counsel's law partner wrote the very article that the hearing court relied upon in holding that a defendant who, by threats, forces a witness to perjure himself thereby makes that witness "unavailable." *See* Respondent's Exhibit B ("As aptly observed by one commentator, the same rules should apply to the witness who refuses to testify out of fear as to the intimidated witness who takes the stand but repudiates his former testimony. (*see*, Kamins, 'The Use of a Witness' Grand Jury Testimony as Direct Evidence Where a Defendant Causes the Unavailability of the Witness' 35 Bklyn. Bar Rev. 135, 138–39 (1984)).").[21] According to the petitioner, that fact rendered his attorney unable to effectively represent him.

▮▮▮▮ "[A] defendant has suffered ineffective assistance of counsel … if his attorney has … an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir.1994). To show an adverse effect, "[a defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane*, 7 F.3d 304,

---

**21.** In relevant part, the Kamins article states as follows:

> If a defendant threatens a witness to the point where the witness changes his testimony but not enough to prevent the witness from testifying, should that defendant be viewed any differently than a defendant who forces a witness to run away? It would seem, therefore, that

the same rules should apply to the witness who, out of fear, refuses to testify as well as to the witness who takes the stand but repudiates his former testimony.

Barry Kamins, The Use of a Witness's Grand Jury Testimony as Direct Evidence Where a Defendant Causes the Unavailability of the Witness, 35 *Brooklyn Barrister* 135, 142 (1984).

309 (2d Cir.1993) (internal quotation marks omitted), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994).

Here, the petitioner contends that the trial court's reliance on the Kamins article was the "heart of its decision" with respect to the question whether Terranova was unavailable, and that, as a result, "one would have expected appellate counsel to have attacked [the article] with great intensity." Petitioner's Memorandum at 53. Nevertheless, "appellate counsel's brief[s] ... w[ere] completely silent with regard to the Kamins' [sic] article." Petitioner's Memorandum at 53. According to the petitioner, "appellate counsel had to choose between representing its client by attacking the Kamins' [sic] article, or protecting itself by not doing so," and "[a]ppellate counsel chose the latter." Petitioner's Memorandum at 55.

I conclude that the fact that, prior to representing the petitioner, the petitioner's appellate counsel wrote an article advocating the opposite position than that which he argued in furtherance of the petitioner's appeal

does not present even a potential conflict of interest.[22] Counsel have ethical obligations to represent their client's interests zealously. The mere fact that, in so doing, they take positions that conflict with those taken while representing other clients, or while writing an article or treatise, does not create a potential conflict of interest.[23]

I further conclude that the petitioner suffered no adverse effect from the conflict alleged here. The petitioner himself concedes that, in both his brief to the Appellate Division and his brief to the Court of Appeals, his appellate counsel spent several pages addressing the issue of whether Terranova was truly "unavailable." Petitioner's Memorandum at 56 ("[A]ppellate counsel's first argument on appeal was that Terranova was not unavailable, and that argument consumed almost 9 pages of his brief.").[24] Accordingly, the petitioner's appellate counsel did attack the reasoning set forth in the Kamins article. The fact that, in the course of that attack, his appellate counsel did not see fit to mention the Kamins article by name does not support

**22.** The petitioner does not contend that either the Appellate Division or the Court of Appeals should have recognized that, given that appellate counsel's law partner wrote the article, a potential conflict of interest existed and, upon recognizing as much, discharged their duty to inquire as to whether a conflict of interest existed. *See United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994) ("When a district court is sufficiently apprised of even the possibility of a conflict of interest, the court first has an 'inquiry' obligation. The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."); *id.* ("When a possible conflict has been entirely ignored, reversal is automatic."); *Ciak v. United States,* 59 F.3d 296, 302 (2d Cir.1995) (holding that automatic reversal rule applies in habeas petitions). Even if he had raised that argument, it would be without merit as I have concluded that the instant facts do not even present the possibility of a conflict of interest.

**23.** *See* K. Gormley, *Archibald Cox. Conscience of a Nation* (1997), at 302. At the oral argument of President Nixon's claim of executive privilege with respect to the Watergate tapes, Special Prosecutor Archibald Cox "threw in a gentle legal tweak, citing [Nixon's lawyer's Charles Alan] Wright's own treatise on civil procedure in support of the proposition that executive privilege issues were traditionally left to the courts, *not* to the president himself."

Apparently, no one suggested that Wright's treatise created a conflict of interest in his representation of the president.

**24.** *See also* Petitioner's Brief to the Court of Appeals at 44 ("In rejecting out of hand the witness' assertion that his truthful testimony was that he was outside of the nightclub at the time of the stabbing, a fact which is corroborated by the defense witness Vincent Michelino, a good friend of Mr. Terranova, the lower Court exceeded its authority in substituting its evaluation of Mr. Terranova's credibility for that of a trial jury."); *id.* at 46–47 ("However, Mr. Terranova was prepared to testify at trial on behalf of the People, and he was prepared to recant his testimony previously given before the Grand Jury. Because of this anticipated recantation, the Trial Court erroneously declared the witness 'unavailable' and permitted the introduction of the witness' Grand Jury testimony .... Thus, the Trial Court, rather than the jury, became the trier of the facts, determined what the witness 'actually observed,' assessed the credibility of the witness, and rejected the recantation that was being proffered.... [N]o appellate court has ever held a witness to be 'unavailable' where the witness announces a willingness to recant his or her prior testimony and testify to what, according to the witness, actually occurred. This Court of Appeals now has an opportunity to define 'unavailability' in a *Mastrangelo* and *Hellenbrand* context.").

**270**

a finding that his ability to represent the petitioner had been adversely affected by a conflict of interest. Indeed, appellate counsel's decision not to cite the article at all was entirely understandable, as the article stood for the proposition advocated by his petitioner's adversary.

I decline to find that the petitioner's appellate counsel was suffering from a conflict of interest which rendered his assistance constitutionally ineffective.

### CONCLUSION

For the foregoing reasons, Geraci's petition is dismissed for failure to timely file. It is also without merit.

So Ordered.