[647 NYS2d 179]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL ROLDAN, Appellant.

First Department, August 1, 1996

## APPEARANCES OF COUNSEL

*Joel Atlas* of counsel *(Jane Levitt* on the brief; *Daniel L. Greenberg,* attorney), for appellant.

*Jennifer Correale* of counsel *(Robert L. Moore* on the brief; *Robert T. Johnson,* District Attorney of Bronx County, attorney), for respondent.

## OPINION OF THE COURT

Tom, J.

The issues raised on this appeal concern whether the judgment of conviction against defendant for murder and attempted murder should be reduced to manslaughter based on the ground of extreme emotional distress; and whether the sentences of consecutive maximum terms should be modified as excessive.

### Overview

This unfortunate incident arose out of a confrontation between three young men and a security guard outside a shopping mall which resulted in the shooting of one youth by the guard.

Defendant Michael Roldan was a security guard employed by Night Hawk Security Company stationed at the Concourse Village Shopping Mall in the Bronx, New York. The evidence indicates that Roldan had a run-in with decedent Hasan Bey and two of his friends, Yorrie Abrhams and Christopher Sinceno, as the result of which Roldan shot Bey once in the head, killing him. The evidence further indicates that the three youths were miscreants who created a great deal of trouble for the security guards and store employees at the mall, and that defendant, on probation himself at the time for a 1989 conviction for criminal possession of a weapon in the third degree, was not licensed to carry the gun with which he admittedly shot the victim. Testimony concerning the circumstances leading up to, and surrounding the shooting, varies greatly.

### The People's Case

Sinceno and Abrhams testified that they, along with Bey, were entering the mall at approximately 3:00 P.M. (they recalled different reasons for being there) through a back entrance. However, the entrance was located in an area which was restricted and fenced in due to construction work. The three proceeded into the restricted area through a gate which had been unlocked so that a McDonald's truck could make a delivery. Sinceno testified that as they passed a loading dock, a security guard, Maureen Martinez, told them they could not enter. The men stated that they then saw Carlos Bermudez, a security guard with whom Bey had previously had a fight. Bermudez told them that they were in a restricted area and would have to leave, but they ignored him and kept walking, which prompted a verbal altercation between Bey and Bermudez.

Abrhams testified that Bey tried to induce Bermudez to fight, although Sinceno recalled that Bermudez was the instigator. When the three men kept walking, Bermudez grabbed a pipe from the security officer and, swinging it, confronted the men. Bey wrested the pipe away from Bermudez and began to punch him in the face until he was unconscious, and Abrhams maintained he also jumped into the fray. Sinceno conceded that Bey and Abrhams continued to beat Bermudez after he had passed out.

Abrhams testified that defendant then appeared with a handgun, pointed it at his chest and pulled the trigger, but the gun did not fire. Defendant is then alleged to have run toward Bey, who had turned to get away, and fired once at Bey from a distance of about one foot as he turned back toward the defendant. Defendant is alleged to have thereafter chased Abrhams through the construction site and into the mall.

Sinceno, who denied that he had recently been arrested for attempted murder until he was shown a copy of the Grand Jury indictment, testified that when defendant appeared with the gun, he pointed it at George Williams, an employee of a nearby McDonald's fast food emporium, but the gun clicked rather than firing. Sinceno maintained that defendant began to shake the gun and when the security guard Martinez said "not him" and directed defendant to Bey, defendant turned around and pointed the gun at Bey. As Bey turned, defendant allegedly fired and then ran after Abrhams, firing at him as he ran. Sinceno testified that he did not see defendant actually pull the trigger in Abrhams' direction.

Joseph Lippertshauser, a truck driver making a delivery to the McDonald's, testified that he saw three young black men walk toward the construction site behind the mall and, as he was preparing to leave, saw the men returning in his direction. Two of the men stopped while the third continued walking to the street. Lippertshauser then observed a fourth man, Bermudez, holding a pipe and then swinging it at the two men. Lippertshauser next saw Bermudez thrown to the ground by the two men and dragged to the third man, who beat Bermudez continuously as the two men held him. Moments later, Lippertshauser saw someone in the group extend an arm, and then heard a pop as someone fell to the ground. Lippertshauser drove away and reported the incident to New York City Police Officers Timothy McCormack and Joseph Curtin.

Rosa Gonzalez, a security guard employed by Wells Fargo Security Co., who was assigned to the food court inside the

mall, testified that she saw a black man run past her followed by an apparently upset defendant, who stated "I got one, shoot *[sic]* him [in] the head. That's all I know." Gonzalez had earlier been approached by a mall employee, who indicated that there was trouble in the back and that security should be called. Gonzalez testified that she had relayed this information to defendant, who responded. At the time of trial, George Williams, the McDonald's employee, was unavailable to testify due to his incarceration in the State of Connecticut.

### The Defendant's Case

Security guard Martinez testified that Bey and his friends were a regular problem at the site, that they had to be physically removed in the past and that they had previous fights with security guards, including one occasion when a guard's face was slashed. On the day in question, Martinez stated that when she tried to stop the men, who were all carrying beer bottles or "40s", from entering the back gate, they ignored her and she overheard one of the men, alluding to Bermudez, state "that's the m———rf——— from the other day", to which another responded "yeah, that's the one."

As Martinez returned to the mall, the men entered into a verbal confrontation with Bermudez, which allegedly lasted about five minutes. When Martinez turned to see what was happening, she saw Bermudez on the ground being punched, kicked, stomped, and repeatedly hit with a two-foot metal pipe until he was unconscious. Martinez believed Bermudez was dead and began screaming into her radio for assistance, at which point the men threatened to "get" her too.

Martinez further testified that defendant then ran by her to give Bermudez assistance and, as he was leaning over the wounded man, the three men attacked him. At this point, Martinez had not recognized defendant, so she continued to scream into the radio and focus her attention on the mall exit, awaiting assistance. Martinez testified that she then heard a single shot and saw two of the men running toward the mall entrance. Martinez denied locking the gate on a responding police officer and did not remember telling a detective she heard three shots. Only two spent shells were recovered from the scene.

Defendant testified that he had been employed as a security guard for Night Hawk Security Company and, as part of his job at the mall, he regularly confronted gangs of young men on a daily basis who, after harassing patrons and store employees, usually ignored his warnings to leave. Defendant stated that on one prior occasion, he confronted thieves, who in turn

confronted him with guns and knives. When those men were apprehended, the store manager refused to press charges due to the fear of repercussions.

Defendant, who became fearful for his own safety, requested a transfer to a different post, and was assigned to protect the construction site outside the mall from trespassers. After the transfer, as the result of concerns for his well-being, defendant purchased a handgun, which he secreted in the construction site. Even at his new post, defendant testified that the same gangs of young men continued to cause trouble, including the three involved in this incident.

On the night in question, defendant stated that he was at the food court when he was approached by Gonzalez, who told him there was trouble out the back. As he approached the construction site, defendant testified that he encountered Martinez at the mall exit, who was hysterical and screaming "they killed him", referring to Bermudez. Defendant, describing himself as being in fear, entered the construction site where Martinez was pointing and saw Bermudez, who was his partner, on the ground, unconscious, bleeding, and surrounded by the three men.

Defendant approached Bermudez, looked at him, thought he was dead, and as he leaned over him, Abrhams allegedly lunged toward defendant with his arms raised. Defendant, averring that he was scared, pointed his gun at Abrhams and identified himself as security, after which he stated "my partner is dead." Defendant claimed that he wanted to hold the men for the police, but Bey tried escaping.

Defendant testified that he recalled thinking "I shouldn't let him go. This guy killed my partner," so he approached Bey from behind, again identified himself as security, and ordered him to stop. As Bey turned, defendant thought he had a black gun in his hand and concluded that "it was him or me", at which point, claiming to be in fear of his life, he fired once.

Abrhams then began to run and defendant stated that he fired a single shot into the air, but Abrhams did not stop and out-ran him. Defendant contended that he did not return to the scene out of fear as the gun was unlicensed and he was on probation.

Pursuant to indictment filed on December 11, 1991, the Bronx County Grand Jury charged defendant with murder in the second degree, two counts of attempted murder in the second degree, two counts of attempted assault in the first

degree, criminal use of a firearm in the first degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. Defendant went on trial, without a jury, before Justice Elbert C. Hinkson and was thereafter convicted of murder in the second degree and attempted murder in the second degree, and was sentenced to consecutive terms of from 25 years to life and $12\frac{1}{2}$ to 25 years, respectively.

This case rests, in significant part, on findings of credibility which were made by Justice Hinkson sitting as the trier of fact. In doing so, the court obviously credited the testimony of Abrhams and Sinceno and discredited that of defendant, and to a great degree, Martinez.

Initially, defendant argues that the People failed to disprove the defense of justification beyond a reasonable doubt. Penal Law § 35.15 provides, in pertinent part, that a person may not use deadly physical force unless that person reasonably believes another person is using or is about to use deadly physical force. Further, deadly physical force may not be used if the individual, with complete safety as to himself and others, can avoid the necessity of using such force by retreating.

In order to determine whether an individual's actions are reasonable within the meaning of the statute, a determination of reasonableness must be made that is both subjective and objective and "[t]he critical focus must be placed on the particular defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant's background and experiences would conclude" (*People v Wesley*, 76 NY2d 555, 559; *see also, People v Goetz*, 68 NY2d 96, 113-115; *People v Davis*, 201 AD2d 827, *lv denied* 83 NY2d 910).

Defendant, therefore, in order to avail himself of the justification defense, cannot be responding to the past use of deadly force, but only to its present or imminent use. Hence, for the purposes of justification, the circumstances of Bermudez' condition is not relevant, except to the extent that it shaped defendant's reasonable belief that he, himself, was in imminent peril. Further, although defendant, as well as Martinez, testified that the three men appeared poised to lunge at defendant, this would not justify the use of deadly force and there is no sound basis to conclude that no avenue of escape existed before he fired.

Defendant did testify that as Bey turned to face him, he believed that the deceased had a gun, which prompted defen-

dant to fire. The court, however, sitting as the finder of fact, discredited the testimony as fabricated. Since there are no additional objective indications to provide a basis by which to disturb the fact finding, such as if Bey was found with something, albeit not a gun, in his hand, or if some other witness had also seen something flash in Bey's hand, and since the Trial Judge's determinations on credibility are entitled to great weight and should not be set aside unless clearly unsupported by the record (*People v Bezares*, 103 AD2d 717; *People v Navares*, 162 AD2d 422, 423, *lv denied* 76 NY2d 942), the defense of justification was not established.

■ We do find, however, that the credible evidence supports a finding, by a preponderance of that evidence, that the defendant acted under extreme emotional disturbance.* Penal Law § 125.25 (1) (a) states:

"A person is guilty of murder in the second degree when:

"1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

"(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime".

The affirmative defense has two principal components: "an objective element requiring sufficient proof that there was a reasonable explanation or excuse for the emotional disturbance, and a subjective element requiring sufficient proof that the conduct was influenced by an extreme emotional disturbance at the time the alleged crime was committed" (*People v White*, 79 NY2d 900, 903; *People v Moye*, 66 NY2d 887, 889-890; *People v Casassa*, 49 NY2d 668, 678). The purpose of the defense is to allow the defendant to prove reduced culpability for a homicide as the result of the influence of emotional trauma (*People v Casassa, supra*, at 675; *People v Patterson*, 39 NY2d 288, 302, *affd* 432 US 197). In the case at bar, we find that the

---

* The People correctly maintain that this issue was not properly preserved for our review but, considering the totality of the circumstances herein, we entertain defendant's argument in the interests of justice.

verdict was against the weight of the evidence (*People v Bleakley*, 69 NY2d 490, 494-495) and that the affirmative defense of extreme emotional distress was proven by a preponderance of the evidence.

Although the People try to portray Martinez as being motivated by self-interest, it is not seriously controverted that defendant, who was familiar with the violent gang activities in the locale, was in a state of fear when he was directed to the scene by a panicking security guard, Martinez, who was unable to summon additional help and who was screaming into her radio that someone had just been killed. When defendant rushed to the scene and encountered the hysterical Martinez, his fear heightened, as he recognized the three men who had become regular troublemakers at the mall, and who outnumbered him three-to-one, as they stood over an apparently dead man lying in a pool of blood. Defendant testified that he believed the three had just killed him. As the three men confronted him, defendant recognized the man who he believed was just killed as his partner. The entire incident, including the shooting, unfolded within a matter of seconds leaving defendant with no opportunity for deliberation other than to react emotionally to the extreme circumstances confronting him. Also relevant to defendant's state of mind was the fact that he had experiences in the recent past with assaults on the job which placed him in sufficient fear of imminent danger to have requested, and received, a transfer. Based on the foregoing, defendant has met his burden of proof in establishing that he acted under extreme emotional disturbance. As a result, we reduce the conviction of murder in the second degree to manslaughter in the first degree, and the conviction of attempted murder in the second degree to attempted manslaughter in the first degree (*see generally*, *People v Vineski*, 162 AD2d 484, *lv denied* 77 NY2d 845).

We also find the imposition of consecutive, maximum sentences to be excessive under the unique circumstances of this case. First, even viewing the evidence in a light most favorable to the People, the evidence with regard to the attempted murder conviction was less than overwhelming. In addition, the circumstances of the entire incident are murky at best, and decedent and his friends instigated the entire chain of events in the first place and had already viciously beaten another security guard to a state in which he was unconscious and appeared dead. Given the context in which the shootings occurred, the court should have exercised its discretion and

taken into account defendant's observations, the fact that the entire scene played itself out in moments (a fact agreed upon by the People's witnesses), and that defendant acted immediately and almost senselessly. As a result, we find that the imposition of consecutive sentences was an abuse of discretion.

Accordingly, the judgment of the Supreme Court, Bronx County (Elbert Hinkson, J.), rendered July 8, 1993, which, after a nonjury trial, convicted defendant of murder in the second degree and attempted murder in the second degree, and sentenced him to consecutive terms of from 25 years to life and $12^{1}/_{2}$ to 25 years, respectively, is unanimously modified, on the law, the facts, and in the exercise of discretion, the convictions are reduced to manslaughter in the first degree and attempted manslaughter in the first degree, respectively, and the matter is remanded to the trial court for resentencing in accordance with this decision.

MURPHY, P. J., SULLIVAN, ROSENBERGER and NARDELLI, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered July 8, 1993, modified, on the law, the facts and in the exercise of discretion, the convictions of murder and attempted murder in the second degree reduced to manslaughter and attempted manslaughter in the first degree and the matter remanded to the trial court for resentencing.