People v Paulino (2024 NY Slip Op 04625)

People v Paulino

2024 NY Slip Op 04625

Decided on September 26, 2024

Appellate Division, First Department

SHULMAN, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: September 26, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Jeffrey K. Oing
David Friedman Ellen Gesmer Martin Shulman Julio Rodriguez III

Index No. 1656/17 Appeal No. 1955 Case No. 2018-2414 

[*1]The People of the State of New York, Respondent,
v
Randy Paulino, Defendant-Appellant.

Defendant appeals from a judgment of the Supreme Court, Bronx County (George R. Villegas, J.), rendered November 1, 2017, convicting defendant, upon his plea of guilty, of attempted murder in the second degree, and imposing sentence.

Twyla Carter, The Legal Aid Society, New York (Graham Ball of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Rafael Curbelo and Peter Coddinton of counsel), for respondent.

SHULMAN, J. 

After his arrest on July 12, 2017, the then-29-year-old defendant was charged, among other related offenses, with attempted murder in the second degree for savagely pummeling a 72-year-old victim in the face "more than forty (40) times [with his fist], during which time [the victim] appeared to be unresponsive." Admittedly, this was defendant's unhinged response to the victim innocently inquiring about repayment of a debt. Shortly after this violent assault, the victim was rushed to a Bronx hospital and required immediate treatment in an intensive care unit. As my dissenting colleague acknowledged, the victim "will require lifetime hospital care," and unlike defendant, the victim was robbed of whatever future he has left.
Ironically, defendant committed this violent crime at his then place of residence located at a supportive Bronx housing development under the auspices of Odyssey House and the New York State Office of Mental Health. Indisputably, defendant suffers from a severe mental illness and has been diagnosed with schizoaffective disorder, bipolar type and schizophrenia, and defendant's residence had been providing services for his mental illness and polysubstance abuse. At the time of his arrest, defendant had been seeing a psychiatrist and mental health therapist at La Casa De Salud, a community-based health care center, on a monthly basis and was prescribed psychotropic medication (i.e., Depakote, Seroquel, and Wellbutrin). Given his mental health history, which the dissent extensively detailed, defendant unsurprisingly admitted he chose not to take his medications for at least five days prior to committing this crime.
Against this backdrop, and quoting comparable findings noted by the dissent in People v Watt (189 AD3d 637, 642 [1st Dept 2020]), defendant's plea, like Mr. Watt's, was "voluntarily, knowingly and freely entered . . . [and he was] fully competent when he entered his guilty plea." Further, two independent CPL article 730 forensic evaluators, two months prior to defendant taking the negotiated plea, collectively opined that defendant did not present with any symptoms of mental illness or cognitive deficits, could be held criminally responsible, was fit to competently proceed with his defense, "[will be able to] participate in the pretrial proceedings[,] . . . was aware of the risks and benefits of going to trial versus accepting a plea [and] the concept of a plea" (id.), and accepted the negotiated plea and sentence with the advice of counsel to avoid a potentially longer sentence [*2]after trial. Thus, defendant and the dissent presumably had to acknowledge that the eight-year sentence Supreme Court imposed was not an abuse of discretion.
My dissenting colleague accurately points out the substantial mitigation present in this case, including, but not limited to, defendant's traumatic upbringing, severe mental illness, history of substance abuse, and lack of prior criminal convictions. However, while defendant's circumstances certainly evoke sympathy, the sentencing court already considered these factors when it granted defendant his bargained-for sentence, significantly lower than the 15 years the prosecutor recommended (see People v Ba, 39 NY3d 1130, 1136 [2023] [Troutman, J., concurring] ["thus the intermediate appellate court may properly consider the bargained-for nature of the sentence, among other appropriate considerations, in determining whether the sentence was unduly harsh or severe"]).
Moreover, this sentence was based on defense counsel's misrepresentation to the court that the prosecution offered 10 years of incarceration. Indeed, the court stated that it "was told that the People were offering 10 years. Based on that representation . . . I came down to eight." After the prosecution advised that its offer remained 15 years, defense counsel acknowledged he had "misspoke[n]" and offered to withdraw the plea. The court chose not to penalize defendant for his counsel's misrepresentation and instead imposed an eight-year sentence.
This Court unquestionably has the authority to reduce a sentence in the interest of justice, even in the absence of a sentencing court's abuse of discretion or extraordinary circumstances (see People v Delgado, 80 NY2d 780, 783 [1992] ["An intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range"]; People v Walsh, 101 AD3d 614, 614 [1st Dept 2012] ["We may substitute our own discretion even where a trial court has not abused its discretion and may reduce a sentence in the interests of justice, taking into account factors such as a defendant's age, physical and mental health, and remorse" (internal quotation marks and citation omitted)]). But such exercise of interest of justice authority is unwarranted here, as defendant's eight-year sentence is neither unduly harsh nor excessive.
Moreover, the focus of each of the following "controlling" precedents the dissent primarily relies on is whether there are any extraordinary circumstances that warrant a sentence reduction. Relying on People v Watt (189 AD3d 637); People v Reyes (89 AD3d 401 [1st Dept 2011]); and People v Jeffries (160 AD2d 406 [1st Dept 1990]), defendant and the dissent argue that these precedents support a sentence reduction. However, unlike these cases, there are no extraordinary circumstances here to justify reducing the sentence in the interest of justice (see People v Fair, [*3]33 AD3d 558 [1st Dept 2006], lv denied 8 NY3d 945 [2007]).
In People v Reyes (89 AD3d 401), the defendant, who had been diagnosed with schizophrenia, was convicted of attempted murder in the second degree and sentenced to a term of 11 years to be followed by five years of postrelease supervision. Notably, this defendant appropriately controlled his mental illness for over 40 years and suffered a mental breakdown leading to this crime only when he could not afford to pay for the medication based on Medicaid's denial of coverage and after suffering an adverse reaction to a prescribed alternative. Based upon these extraordinary circumstances, as mitigating factors in his case, this Court reduced his sentence to eight years' incarceration (id.).
Unlike defendant, who acquired a high school equivalency diploma and was gainfully employed for a period of time, the defendant in People v Watt (189 AD3d at 640), in addition to his severe mental illness, also suffered "intellectual and mental deficiencies since his childhood" (he was assessed an IQ of 48 at the age of 17). Mr. Watt, who experienced persistent mental illness and continued to hear voices despite being prescribed antipsychotic medication, was convicted of attempted murder in the second degree and robbery in the first degree and was initially sentenced to two concurrent terms of 14 years in prison followed by five years' postrelease supervision (id. at 637). Based on the extraordinary circumstance of this defendant's "significant personal limitations," this Court reduced his sentence to concurrent terms of 10 years' incarceration (id. at 638).
In People v Jeffries (160 AD2d 406), the severely suicidal defendant who suffered from auditory hallucinations and depression was convicted of two counts of manslaughter in the first degree and sentenced to two concurrent terms of 8 1/3 to 25 years in prison for killing her two daughters. There was record psychiatric evidence that while this defendant was fit to proceed to trial, she nonetheless "could not be held criminally responsible for her acts" (id. at 406). Relying on this extraordinary circumstance, this Court reduced defendant's sentence in the interest of justice to two concurrent terms of five to 15 years in prison (id.). Here, the dissent's principal reliance on defendant's severe mental illness (and his secondary polysubstance addiction) is not an extraordinary circumstance warranting a sentence reduction (see People v Gibbs, 280 AD2d 698, 699 [3d Dept 2001], lv denied 96 NY2d 829 [2001]). There simply is no basis to reduce the sentence since all the mitigating factors defendant cites are outweighed by the seriousness of his offense.
Questioning the utility of defendant completing his eight-year sentence due to the conceded inadequacy of mental health care in prison, my dissenting colleague places undue emphasis on rehabilitation. Without any factual record evidence, the dissent argues that reducing defendant's sentence to the minimum five [*4]years would enable defendant "to receive community-based mental health services—potentially or even likely to be more effective than 'often inadequate' prison mental health services—earlier than he otherwise would," and achieve mental health stability and successful medication management sooner. The goals of the services defendant actually received were clearly elusive prior to his vicious assault of the victim. Further, the dissent appears to be speculating as to this latter goal while glossing over public safety, one of several primary objectives underlying a penal sanction (see People v Farrar, 52 NY2d 302, 305 [1981] ["The determination of an appropriate sentence requires . . . due consideration given to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence"]). From 2011 to 2017, defendant had been provided extensive inpatient and outpatient treatment for his severe mental illness. At the time he committed this heinous crime, he had been residing in supportive housing and received services and psychotropic medication from a community-based health center, albeit without achieving success in managing his severe mental illness. Thus, there are no assurances that if defendant were released today based on a compassionate exercise of a sentence reduction, he would pose no threat to public safety. Stated differently, the bargained-for sentence clearly reflects the need for societal protection which, given defendant's mental health history, trumps defendant's poor prospects for rehabilitation at this time.
Despite the violent nature of the crime, Supreme Court imposed on defendant a sentence not only lower than the 10 years defense counsel mistakenly believed was offered, but much lower than the actual 15 years the prosecution did offer (see People v Rochford, 220 AD3d 546, 546 [1st Dept 2023], lv denied 41 NY3d 905 [2024] ["The mitigating factors that defendant cites are either adequately taken into account by the risk assessment instrument or are outweighed by . . . the seriousness of his criminal offense."]). Moreover, defendant's sentence of eight years' incarceration followed by five years of postrelease supervision is either equal to or less than the modified sentences ordered by this Court in the cases upon which the dissent and defendant rely.
Accordingly, the judgment of the Supreme Court, Bronx County (George R. Villegas, J.), rendered November 1, 2017, convicting defendant, upon his plea of guilty, of attempted murder in the second degree, and sentencing him to a determinate prison term of eight years and five years of postrelease supervision, should be affirmed.
All concur except Gesmer and Rodriguez, JJ. who dissent in a separate Opinion by Rodriguez, J.

RODRIGUEZ, J. (dissenting)
 

On July 12, 2017, after the 72-year-old victim told Mr. Paulino that the latter owed him money, Mr. Paulino [*5]punched the victim more than 40 times in the face, even after he fell unconscious. The victim was taken to the hospital by ambulance and admitted to the intensive care unit. He will require lifetime hospital care. Put simply, the crime was undoubtedly violent and heinous.
Nevertheless, Mr. Paulino's excessive sentence claim does not solely turn on the facts of the underlying offense. Instead, this Court is also called upon to consider other mitigating circumstances present in making its determination as to whether the imposed sentence should be reduced in the interest of justice (see People v Fernandez, 84 AD3d 661, 664 [1st Dept 2011] ["in deciding what sentence is appropriate, this Court must consider various factors including the nature of the crime, the defendant's circumstances, the need for societal protection, and the prospects for the defendant's rehabilitation"] [internal quotation marks and citations omitted]; People v Walsh, 101 AD3d 614, 614 [1st Dept 2012]; People v Ehrlich, 176 AD2d 203, 204 [1st Dept 1991]; see also People v Ba, 39 NY3d 1130, 1136 [2023] [Troutman, J., concurring] ["thus the intermediate appellate court may properly consider the bargained-for nature of the sentence, among other appropriate considerations, in determining whether the sentence is unduly harsh or severe"]).
I "appreciate[] the severity of the injury sustained by [Mr. Paulino's] innocent victim" (People v Reyes, 89 AD3d 401, 403 [1st Dept 2011]) and "have no intention of minimizing the seriousness of [Mr. Paulino's] crime" (People v Harrison, 120 AD2d 358, 359 [1st Dept 1986], lv denied 68 NY2d 668 [1986]). Nonetheless, under the circumstances of this case, and notwithstanding that the court below did not abuse its discretion, I believe that Mr. Paulino's eight-year sentence is excessive and should be reduced in the interest of justice.
I.
When Mr. Paulino was just four years old, his father picked him up and, with a gun in hand, carried him to the garage. Mr. Paulino's mother was inside feeding her two-year-old daughter. After telling his son that he would no longer have a father, Mr. Paulino's 24-year-old father shot himself in the head. Hearing the gunshot and screaming, Mr. Paulino's mother ran to the carport where she found her son, covered in his father's blood and brain matter, screaming, "Daddy killed himself. Daddy killed himself." Hardship would continue to plague Mr. Paulino's childhood, adolescence, and young adulthood, with devastating effects.
At 10 years old, Mr. Paulino began to struggle academically.[FN1] He experienced social isolation, often wanted to be left alone, fell behind in his classes, and had behavioral problems. At 12, Mr. Paulino first started to drink alcohol. At 16, he began engaging in self-mutilation by cutting himself. Despite her son's disturbing behavior, Mr. Paulino's mother did not pursue treatment for him because she did not understand the process. In addition, she was overwhelmed by her husband's suicide years earlier[*6], and later recalled that for three years she felt like she was "going crazy." Mr. Paulino subsequently dropped out of school after completing the eighth grade.[FN2] Moreover, he reported to the psychiatrists who conducted his CPL article 730 examinations that he grew up with domestic violence in the home involving his stepfather and that he was physically abused.
By age 20, Mr. Paulino abused alcohol on a daily basis. He also used heroin, cocaine, K2, and ecstasy. Furthermore, he experienced intermittent homelessness throughout these years.
As is well documented in his medical records, Mr. Paulino was first hospitalized for mental health issues in June 2011, when he was 23 years old. At that time he was admitted to Metropolitan Hospital with visual and auditory hallucinations and paranoia. In July 2012, he was admitted to University Hospital SUNY Downstate for suicidal ideation as a result of having climbed onto a roof.
In a separate instance, on September 11, 2012, at 24 years old, Mr. Paulino attempted suicide. He was living in a shelter when he experienced delusions of grandeur. After drinking alcohol and believing himself to be God, Mr. Paulino tried to jump off the roof of his mother's apartment building. When he was admitted to the hospital for treatment, he presented with paranoid and disorganized thoughts, depressed mood, and suicidal ideation.
On November 20, 2012, Mr. Paulino was transferred to Bronx Psychiatric Center for further treatment and stabilization in an inpatient setting. During his intake, Mr. Paulino reported that he started hearing voices in his early teens, feeling depressed and paranoid at 14 years old, and seeing things, like patterns changing, at 21. Because of Mr. Paulino's history of suicide attempts and depression, Bronx Psychiatric Center's initial treatment plan provided, among other things, that the staff were to check on him every 15 minutes. After months of treatment, he was discharged on April 9, 2013, and referred for outpatient services.
On May 29, 2015, Mr. Paulino was again hospitalized for depression and suicidal ideation at Lincoln Medical and Mental Health Center. On June 8, 2015, he was discharged with a referral for outpatient services. Later that same month, he was evaluated by the psychiatric emergency department at Lincoln Medical and diagnosed with unspecified psychosis. He was discharged the same day with a follow-up appointment scheduled for later that week at BronxCare. However, on October 6, 2015, while living at the Odyssey House, Mr. Paulino was evaluated once again by the psychiatric emergency department at Lincoln Medical, whose records note that he presented with psychotic symptoms and was in need of acute psychiatric intervention. On October 7, 2015, upon being found in need of a higher level of care, Mr. Paulino was transferred to Beth Israel Hospital for inpatient services. It is unclear from the record when Mr. Paulino was discharged from Beth Israel. On December 3, 2015, Mr. Paulino [*7]was again admitted to Lincoln Medical with a diagnosis of paranoid schizophrenia and was discharged on December 15, 2015.
Throughout the years, Mr. Paulino has been diagnosed with, among other things, major depressive disorder, recurrent, severe with psychotic features; polysubstance dependence (alcohol, cocaine, ecstasy, heroin, and K2); and paranoid schizophrenia. Furthermore, for his mental health issues, he was known to Metropolitan Hospital, SUNY Downstate, Bronx Psychiatric Center, Lincoln Medical and Mental Health Hospital, North Central Bronx Hospital, Beth Israel Hospital, and Bronx-Lebanon Hospital. The records repeatedly note that upon hospitalization, Mr. Paulino was cooperative with staff and peers, compliant with treatment, and did not pose a threat to himself or others.
Notably, when interviewed by a forensic social worker for the defense after his arrest, despite receiving treatment at the mental health facility at Rikers Island, Mr. Paulino still exhibited symptoms of his mental illness. In particular, he reported that he had a child in common with a member of the British Royal Family. This same social worker concluded that, although Mr. Paulino could be stabilized with prescription medications, he will nevertheless need psychiatric care for the rest of his life. Mr. Paulino's mother reported to the social worker that after years of grappling with severe mental illness, Mr. Paulino asked her, "Remember who I was before?" He also disclosed to his mother that "life had ended for him" after his father's suicide.
Before turning to the merits of Mr. Paulino's excessive sentence claim, some additional context relevant to our analysis ought to be highlighted. The instant offense occurred at the Odyssey House, a facility that provides specialized housing for people living with addiction and other mental health issues where both Mr. Paulino and the victim were living. Prior to the offense, Mr. Paulino had been seeing a psychiatrist and therapist on a monthly basis, but, for reasons unknown, at the time of the offense he had not taken his prescribed psychiatric medication for five days.[FN3] After the incident, Mr. Paulino himself called 911 to report what had transpired, and when arrested he told police in sum and substance that he was and should be addressed as God. Upon examination at Rikers Island following the arrest, Mr. Paulino was classified as severely mentally ill and diagnosed with schizoaffective disorder, bipolar type, and schizophrenia.
Additionally, during a suicide prevention screening one day after the offense and arrest, the screening officer commented that Mr. Paulino appeared "to be unstable at time/mental illness." In completing the screening form, the officer also checked off one "shaded box" denoting"[d]etainee is incoherent, disoriented, or showing signs of mental illness." Despite the form's instructions directing that constant supervision be instituted and a supervisor notified if any shaded box on the form were [*8]checked, the officer affirmatively marked that neither preventative measure was initiated. Two days later, on July 15, 2017, Mr. Paulino was transferred to mental observation housing so that he could receive a "higher level of care." These medical records state that Remeron and Haloperidol were administered to Mr. Paulino daily starting July 23, 2017, and that Depakote was administered daily starting July 24, 2017.
Finally, this is Mr. Paulino's first and only criminal conviction.
II.
This Court has "broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range"�(People v Delgado, 80 NY2d 781, 783�[1992];�see�CPL 470.15�[6] [b]). "This sentence-review power may be exercised, if the interest of justice warrants, without deference to the sentencing court"�(Delgado, 80 NY2d at 783).[FN4]
To begin, the precedent of this Court amply supports a sentence reduction here.[FN5] For instance, in People v Reyes (89 AD3d 401), relied on by Mr. Paulino, the defendant was convicted of attempted murder in the second degree and sentenced to a term of 11 years to be followed by five years of postrelease supervision. This Court reduced the defendant's sentence to the extent of reducing his term of incarceration to eight years.
Mr. Reyes—who "sustained unspeakable abuses" as a young boy "for participating in peaceful protests" in the Dominican Republic—began hearing voices at the age of 15 (id. at 401). After coming to the United States, the "[defendant] suffered a mental breakdown and became suicidal" resulting in his hospitalization on three separate occasions (id.). A month before the offense, Mr. Reyes's "beloved" mother died (id.). After the funeral, the defendant visited his psychiatrist because he had been off his medication for a week due to his inability to afford the cost when Medicaid declined to cover it; he then stopped taking the medication once more when he had a bad reaction to the substitute prescribed by his doctor (id. at 401). Thereafter, the defendant's "mental condition deteriorated to such a degree that he suffered a psychotic break that compelled him to act upon the voices commanding him to kill" (id.).[FN6]
Following his arrest, Bellevue Hospital staff reported "that defendant wrote fluently with paranoid content detailing his persecution by a group of black magic practitioners" (id. at 402). Mr. Reyes was diagnosed with schizophrenia, paranoid type, or psychotic disorder not otherwise specified and was declared unfit to proceed (id.). He later stabilized and was found fit to proceed (id.). Mr. Reyes accepted responsibility and "expressed genuine remorse," however the trial court "expressed concern about defendant's decision not to pursue a mental illness defense" (id.).
In reducing the sentence, this Court noted that the incident was the defendant's first and only contact with the criminal justice system and that the defendant had successfully [*9]managed his mental illness for over 40 years (id. at 402-403). This Court acknowledged that it was "evident that the stress of the loss of [the defendant's] mother, his inadvertent medication lapse, and the psychosis that resulted, conspired to cause this tragic incident" (id. at 402). Moreover, this Court stated that the "[d]efendant's treating psychiatrist opined that defendant has insight into his mental condition and that with properly managed psychiatric care, he can continue to function normally" (id. at 402-403). Additionally, in reducing Mr. Reyes's sentence, this Court concluded that a sentence of 11 years was unduly harsh "for a man suffering from such severe mental illness that his capacity to form the required element of intent for the subject crime is questionable at best" (id. at 403).
Furthermore, in People v Watt (189 AD3d 637 [1st Dept 2020]), also cited by Mr. Paulino, the defendant was convicted of attempted murder in the second degree and robbery in the first degree and was initially sentenced to two concurrent terms of 14 years in prison followed by five years' postrelease supervision, before this Court reduced the carceral portion of his sentence to concurrent terms of 10 years. Notwithstanding "the horrific nature of the crime," this Court reduced Mr. Watt's sentence "in view of defendant's significant personal limitations, which we conclude would make it unjust for him to be sentenced to a longer period of incarceration than two of his codefendants" (id. at 638).
On the night of the incidents in Watt, the defendant and his codefendants surrounded a man sitting on a bench, when one codefendant smashed a large rock on the man's head (id. at 638-639). All four defendants then kicked the man, and a codefendant robbed him (id. at 639). "The man suffered bleeding to the brain, a broken nose, facial fractures, and an open wound to the back of his head requiring 15 stitches" (id.). When the group next encountered a man who was homeless sleeping on a park bench, a codefendant proceeded to hit him in the face (id.). All four defendants repeatedly hit the second man before throwing him into the Hudson River, at which point they proceeded to throw rocks at him (id.). The man clung to the riverbank overnight and was rescued in the morning (id.). "He suffered a broken jaw, broken leg, multiple abrasions, and hypothermia, which required a month-long stay in the hospital" (id.).
The mental observation unit at Rikers Island described Mr. Watt as suffering from "a severe and persistent mental illness" and diagnosed him with several disorders (id.). Since being detained at Rikers Island, the defendant reported he had attempted suicide 35 times and that "he continued to hear the voices that had plagued him since his childhood, despite being prescribed antipsychotic medication" (id.).[FN7]
In reducing Mr. Watt's sentence, this Court highlighted that "the record unequivocally shows that defendant has suffered intellectual and mental deficiencies [*10]since his childhood, which our Court has held renders a defendant's conduct less blameworthy" (id. at 640).[FN8] Further, Mr. Watt was 19 years old and had significant cognitive disabilities, both of which rendered him "overly susceptible to influence and manipulation," in turn contributing to the commission of the crime (id.). Prior to the incident, the defendant only had one youthful offender adjudication, which this Court found suggested that his association with his codefendant "played an outsize[d] influence on defendant and his role in the attacks" (id.). This Court also noted that "in research cited by defendant, people with serious psychiatric disorders are more likely to be violently victimized and housed in segregation while incarcerated" (id. at 641). Acknowledging that Mr. Watt attempted suicide over 35 times while at Rikers Island, this Court held "that an extended term of incarceration would have an extremely harsh impact on defendant" (id.). This Court therefore reduced Mr. Watt's sentence in recognition that his codefendants' received prison terms of 10 years (id.).
Lastly, in People v Jeffries (160 AD2d 406 [1st Dept 1990]), also relied on by Mr. Paulino, the defendant was convicted, upon her guilty plea, of two counts of manslaughter in the first degree and sentenced to two concurrent terms of 8 to 25 years in prison for killing her two daughters, ages eight and four, by holding plastic bags over their heads until they were asphyxiated. This Court reduced Ms. Jeffries's sentence in the interest of justice to two concurrent terms of 5 to 15 years in prison, finding the sentence imposed, although legal, was "unduly harsh and severe" because "the events both prior and subsequent to the incident" were "heartrending" (id.).
Specifically, in Jeffries, the defendant "lived in great poverty," suffered from auditory hallucinations and depression "so severe" that she was suicidal for nearly a year prior to the incident, and made a plan to commit suicide because she had no hope that she could provide a better life for her daughters (id.). Not wanting her children to be placed in a foster home, she decided to kill them as well (id.). The defendant, whom the prosecutor described as a "competent and loving mother whose daughters were healthy and well adjusted," explained her plan to her daughters, but after she held the plastic bags over their heads and they both ceased breathing, the defendant's mother arrived at the apartment before she could commit suicide herself (id.).
Ms. Jeffries made a full statement to the police, and repeatedly asked for the death penalty so she could rejoin her daughters in heaven (id.). Three of the four psychiatrists who examined the defendant found her fit to stand trial but observed that she suffered from auditory hallucinations in which she heard God and Jesus speaking to her (id. at 406-407). Further, Ms. Jeffries had no prior criminal history (id. at 406). The trial court "noted that had there been a trial, the [*11]essential question would have been whether defendant had the necessary mental capacity to be found guilty of criminal conduct; this may well have resulted in a resounding no, in view of the psychiatric evidence" (id. at 407). The court imposed the sentence, but stated, "no purpose enumerated in the Penal Law [is] remotely served by the imposition of this sentence" (id. at 407).
III.
Here, like the defendant in Reyes, Mr. Paulino experienced immense trauma as a young child, has been psychiatrically hospitalized multiple times, and suffered from mental illness and a medication lapse which contributed to the commission of the underlying offense. Also, similar to the defendants in Reyes and Watt, who began hearing voices as a teenager and child, respectively, Mr. Paulino started hearing voices at 14 years old. Additionally, as with the defendants in Reyes, Watt and Jeffries, Mr. Paulino has a history of suicidal ideation and, like all three, inarguably suffers from severe mental illness. Lastly, similar to the defendants in Reyes and Jeffries, this incident represents Mr. Paulino's first and only criminal conviction. 
To that end, Mr. Paulino's lack of a criminal record supports a sentence reduction (see People v Salas, 220 AD3d 545 [1st Dept 2023], lv granted 41 NY3d 1004 [2024]; People v Spruill, 200 AD3d 475, 475-476 [1st Dept 2021], lv denied 38 NY3d 930 [2022]; People v Deyvone C., 161 AD3d 648, 648 [1st Dept 2018]; People v Kwame S., 95 AD3d 664, 664 [1st Dept 2012]; Reyes, 89 AD3d at 402; People v Kuramura, 148 AD2d 331, 331 [1st Dept 1989], lv denied 74 NY2d 812 [1989]; People v Melendez, 129 AD2d 449, 450 [1st Dept 1987]; People v Obaidat, 99 AD2d 693, 693 [1st Dept 1984]; People v Haynes, 100 AD2d 832, 833 [1st Dept 1984]; People v Nieves, 49 AD2d 515, 515 [1st Dept 1975]).
Likewise, Mr. Paulino's mental health issues (see Watt, 189 AD3d at 638; Reyes, 89 AD3d at 403; Jeffries, 160 AD2d at 406-407) and substance abuse history further militate in favor of a sentence reduction (see People v Mitchell, 168 AD3d 531, 532 [1st Dept 2019]; People v Walsh, 101 AD3d at 614; Nieves, 49 AD2d at 515).
Furthermore, research cited by Mr. Paulino demonstrates that people with serious psychiatric needs are more likely to be violently victimized and housed in segregation while in prison. That research also shows that the vast majority of people with mental illness in jails and prisons do not receive care, and for those that do, the care is generally inadequate.[FN9] This is of particular concern given Mr. Paulino's history of suicide attempts (see Watt, 189 AD3d at 641).
This case raises an important question: What is the utility of extended incarceration under the present circumstances? Specifically, where, among other things, the offense occurred during a time when Mr. Paulino had been unmedicated for five days and, moreover, the record suggests—as evidenced by Mr. Paulino's comments to the police when arrested and a subsequent mental examination—that his [*12]severe mental illness contributed to what is his first and only criminal conviction.
To that point, even a reduction in Mr. Paulino's sentence to the minimum of five years' incarceration would be sufficiently retributive for the instant offense,[FN10] while simultaneously fulfilling an additional and equally significant objective underlying penal sanction, namely, Mr. Paulino's rehabilitation (see People v Suitte, 90 AD2d 80, 83 [2d Dept 1982] ["As has been oft-stated, the four principal objectives of punishment are deterrence, rehabilitation, retribution and isolation"]). To the extent a term of incarceration would facilitate increased stability for Mr. Paulino through medication management, which, in turn, would support his rehabilitation, that goal, if it is to be achieved, can be reached in less than eight years. A reduction would therefore save taxpayer dollars and enhance public safety while recognizing that, because of his undeniably difficult life circumstances, Mr. Paulino is an individual deserving of compassion (see People v Greene, 41 NY3d 950, 954 [2024] [Wilson, C.J., concurring] ["mental health treatment in prison is costlier than community-based treatment; individuals with mental illness are at greater risk of detention in prison and extended incarceration; prison mental health resources are often inadequate; and individuals living with mental illness face greater risk of harm and abuse while behind bars"]). Indeed, a sentence reduction would not only involve a shorter period of incarceration in which Mr. Paulino would avoid further risks that might exacerbate his psychiatric symptoms, but also allow him to receive community-based mental health services—potentially or even likely to be more effective than "often inadequate" prison mental health services—earlier than he otherwise would (id.).[FN11] All that said, I am mindful "that an extended term of incarceration would have an extremely harsh impact on" Mr. Paulino (Watt, 189 AD3d at 641).
Critically, as recounted above, Mr. Paulino began hearing voices when he was 14 years old. Yet, he refrained from engaging in criminal conduct until he was 29 despite, as his medical records indicate, struggling significantly with persistent and profound mental illness for at least the five years prior to commission of the instant offense. Thus, although the record suggests that Mr. Paulino's mental illness contributed to the commission of the underlying offense, it nevertheless appears that the instant offense was aberrational for Mr. Paulino and that, with the appropriate interventions, treatment, and medication management, he will be able to live a law-abiding life. Simply put, a sentence reduction here would not only extend a benefit to Mr. Paulino but to the community at large (see Nieves, 49 AD2d at 515 ["Under all of these circumstances, the striking of the minimum sentence would give greater scope to the community's efforts to rehabilitate the defendant, while, at the same time, the retention of [*13]the remaining sentence would satisfy the community's legitimate interest that his crime be punished"]).
It must be emphasized that the underlying incident was inarguably violent, this Court "takes very seriously the severity of the injuries inflicted on the . . . victim[] in this case," and my opinion that Mr. Paulino's prison sentence should be reduced "in no way diminishes [my] horror at the pain and suffering . . . endured at the hands of [Mr. Paulino]" (Watt, 189 AD3d at 640). Nonetheless, this Court's sentence review power is not restricted to non-violent crimes, we have reduced sentences where appropriate even when the convictions at issue stemmed from more serious conduct resulting in loss of life,[FN12] and the underlying offense is but one circumstance that this Court may consider when determining whether a sentence is excessive.
The substantial mitigation present, including, among other things, Mr. Paulino's well-documented history of severe mental illness—which is marked by multiple hospitalizations, numerous diagnoses, and repeated suicide attempts—and his history of substance abuse, weighs in favor of a sentence reduction. Moreover, the instant offense is Mr. Paulino's first and only criminal conviction; he had been unmedicated for five days at the time of the offense; Mr. Paulino himself called 911 for assistance; and his statements to the police officers when arrested (which suggest Mr. Paulino was in a state of mind strikingly reminiscent to that of when he first attempted suicide in 2012) indicate that his mental illness contributed to the commission of the crime.[FN13]
It remains that before Mr. Paulino became violent towards the victim, he struggled for years with unrelenting, severe mental illness that often went inadequately addressed. Before that, he was a 23-year-old who tried to jump off his mother's apartment building. At 20 years old, he was unhoused, drinking alcohol daily, and struggling with polysubstance abuse. At 16, without necessary support, he dealt with his trauma through self-mutilation. At 12, without necessary support, he dealt with his trauma by drinking alcohol. Before that, he was a socially isolated and lonely 10-year-old child who exhibited behavioral problems at school. And, at just four years old—a mere preschooler—Mr. Paulino witnessed his father shoot himself in the head.
For all of these reasons, I dissent and would reduce Mr. Paulino's sentence in the interest of justice.
Judgment, Supreme Court, Bronx County (George R. Villegas, J.), rendered November 1, 2017, affirmed.
Opinion by Shulman, J. All concur except Gesmer and Rodriguez, JJ. who dissent in a separate Opinion by Rodriguez, J.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: September 26, 2024

Footnotes

Footnote 1: Mr. Paulino has gone through immense trauma in his life, and the details of all related events are not fully recounted here. Although not discussed in full, all of defendant's circumstances contributed to my opinion that his sentence should be reduced.

Footnote 2: Mr. Paulino later enrolled in a high school equivalency program and received his diploma.

Footnote 3: Mr. Paulino's medical records suggest that at points in 2012 and 2015, his hospitalizations coincided with periods of repeated medication noncompliance, the reasons for which are not explained by the record.

Footnote 4: As the majority acknowledges, this Court's authority to reduce a defendant's sentence in the interest of justice is not limited to cases which sufficiently demonstrate an indeterminate degree of extraordinariness or in which Supreme Court abused its discretion (see People v Baldwin, 39 NY3d 1097, 1097-1099 [2023] [Wilson, J., concurring]; People v Watt, 189 AD3d 637, 638 [1st Dept 2020] ["We reduce defendant's sentence under our interest of justice powers, as we do not find an abuse of discretion by the sentencing judge"]; Walsh, 101 AD3d at 614 ["We may substitute our own discretion even where a trial court has not abused its discretion"] [internal quotation marks omitted]; see also CPL 470.15�[6] [b]). In addition, our "discretionary sentence review power . . . applies even where a sentence . . . is the result of a bargained-for plea" (Ba, 39 NY3d at 1131 [Garcia, J., concurring]).
Notwithstanding the majority's acknowledgment of the correct standard, their observation regarding "the focus" of certain decisions cited here plainly suggests that such cases stand for the proposition that some qualitatively extraordinary circumstance is required for this Court to reduce a defendant's sentence in the interest of justice. This is incorrect, since—at the risk of redundancy—"a criminal defendant need not show extraordinary circumstances or an abuse of discretion by the sentencing court in order to obtain a sentence reduction under CPL 470.15 (6) (b)" (Baldwin, 39 NY3dat 1098 [Wilson, J. concurring], quoting People v Thomas, 194 AD3d 1405, 1406 [4th Dept 2021], lv denied 37 NY3d 1165 [2022]).

Footnote 5: It should be noted, however, that while case comparison is often helpful or even instructive, it is no substitute for the fact-specific inquiry, required for proper evaluation of an excessive sentence claim, into the totality of a defendant's individual circumstances (see infra at n 7). The majority's comment regarding "controlling" authority is thus misplaced.

Footnote 6: The dissent in Reyes expounds upon the facts of the underlying offense, stating, "Defendant, without any provocation or justification, tried to stab the victim, Manuel Einoa, with a knife. When defendant missed, the victim tried to run away. Defendant then grabbed a machete, chased Mr. Einoa and proceeded to repeatedly hack at his head and arm, inflicting massive injuries, including three severed fingers, and severely cutting and almost amputating the palm of Mr. Einoa's hand" (id. at 403).

Footnote 7: In Reyes, the defendant's treating psychiatrist opined that he had insight into his mental illness and that he could "function normally" with "properly managed psychiatric care"; Mr. Reyes successfully managed his mental illness for more than 40 years; and his medication lapse was "inadvertent," all of which this Court relied on in reducing the sentence (Reyes, 89 AD3d at 402-403). In contrast, in Watt, this Court reduced the defendant's sentence despite the fact that he continued to experience auditory hallucinations even while taking antipsychotic medication (Watt, 189 AD3d at 639). These two cases, read in tandem, illustrate that severe mental illness is a factor this Court considers when adjudicating an excessive sentence claim, and further suggest that the defendant does not necessarily have to demonstrate that their symptoms are successfully treated through medication to be entitled to a sentence reduction. In other words, and as noted, although case comparison is often helpful and instructive, excessive sentence claims require a fact-specific inquiry into the totality of the defendant's individual circumstances.

Footnote 8: This Court's decision in Watt indicates that, among other things, the defendant began taking antipsychotic medication at age eight; he began experiencing auditory hallucinations at age nine; he was diagnosed with selective mutism at age 16; he underwent a psychological evaluation at age 17, was found to read at a first grade reading level, and was assessed a full scale IQ score of 48, which was "well below the 1st percentile" (id. at 638). Further, at 17, the New York City Department of Education prescribed that Mr. Watt only receive at home instruction. It was at this time that he met one of his codefendants who "held himself out as a friend to defendant. Defendant soon began drinking heavily, reportedly at the urging of his companions, and was hospitalized on one occasion for alcohol poisoning" (id.).

Footnote 9: See David Cloud & Chelsea Davis, Treatment Alternatives to Incarceration for People with Mental Health Needs in the Criminal Justice System: The Cost-Saving Implications, Vera Institute of Justice: Substance Use and Mental Health Program (Feb. 2013), available at https://www.vera.org/downloads/publications/treatment-alternatives-to-incarceration.pdf (last accessed August 26, 2024); see also Watt, 189 AD3d at 641.

Footnote 10: Of course, to say the least, five years' incarceration, especially for someone as mentally ill as Mr. Paulino, is no slight sentence.

Footnote 11: See also id. at 954 n 2, citing Megan J. Wolff, Weill Cornell Medicine Psychiatry, Fact Sheet: Incarceration and Mental Health, https://psychiatry.weill.cornell.edu/research-institutes/dewitt-wallace-institute-psychiatry/issues-mental-health-policy/fact-sheet-0#footnoteref48_2jzqryh (last updated May 30, 2017).

Footnote 12: Notably, we have reduced sentences for defendants convicted of more serious offenses (see People v Marten, 227 AD3d 554, 555 [1st Dept 2024] [manslaughter in the first degree as a hate crime]; People v Fisher, 202 AD3d 599 [1st Dept 2022] [manslaughter in the first degree]; People v Flores, 198 AD3d 546 [1st Dept 2021], lv denied 38 NY3d 927 [2022] [same]; People v Moye, 148 AD2d 345, 345 [1st Dept 1989] [same]; People v Mami, 128 AD2d 389, 389-390 [1st Dept 1987], lv dismissed 73 NY2d 857 [1988] [same]; People v Jordan, 144 AD2d 295, 295 [1st Dept 1988] [same]; Nieves, 49 AD2d at 515 [same]; People v Salas, 220 AD3d 545 [murder in the second degree]; People v Harrison, 120 AD2d at 358 [same]; Obaidat, 99 AD2d at 693 [same]), and for the same conviction (see People v Williams, 219 AD3d 409, 409 [1st Dept 2023] [modifying to run sentences concurrently on convictions for, inter alia, attempted murder in the second degree]; People v Roldan, 222 AD2d 132, 141 [1st Dept 1996]). Thus, to be clear, notwithstanding the egregious and brutal nature of the underlying criminal conduct, this Court nevertheless reduces sentences in the interest of justice when the circumstances compel such results.

Footnote 13: In relying on defendant's plea in light of the CPL 730 examination results, the majority suggests the equivalence of "two distinct determinations": capacity for judicial proceedings and mens rea at the time the crime was committed (People v Sidbury, — NY3d &mdash, 2024 NY Slip Op 03318 [2024]). Whether or not the evidence at trial would have sufficiently established the requisite mens rea, there can be little dispute that the circumstances demonstrate a significant contribution of mental illness to the crime's commission.